Argued and submitted January 21, decision of Court of Appeals reversed and LUBA affirmed September 9, reconsideration denied November 24, 1987

1000 FRIENDS OF OREGON et al,
*Respondents on Review,*

*v.*

WASCO COUNTY COURT et al,
*Respondents (Below),*
CITY OF RAJNEESHPURAM et al,
*Petitioners on Review.*

(LUBA 81-132; CA A39509; SC S33322)

742 P2d 39

Allen L. Johnson of Johnson & Kloos, Eugene, argued the cause for Petitioners on Review. With him on the petition were Edward J. Sullivan of Mitchell, Lang & Smith, Portland, and Leslie Roberts of Josselson, Potter & Roberts, Portland.

Kenneth M. Novack of Ball, Janik & Novack, Portland, argued the cause and filed a response for Respondents on Review. With him on the response was Robert E. Stacey, Jr., Portland.

LINDE, J.

## LINDE, J.

The issue before us is whether a 2-1 decision by a board of county commissioners to call an election on a proposal to incorporate a city was invalid because one of the favorable votes was cast by a member who had undisclosed business dealings with proponents of the incorporation. The Land Use Board of Appeals (LUBA), after taking evidence on the transactions, rejected this challenge to the county board's action. On review, the Court of Appeals reversed LUBA's order and invalidated the county board's decision because one of the participants was not impartial. *1000 Friends of Oregon v. Wasco Co. Court,* 80 Or App 532, 723 P2d 1034 (1986). We reverse the Court of Appeals and affirm LUBA's order.

The participation of the county board member, Wasco County Judge Richard Cantrell, in the vote was one of several grounds on which 1000 Friends of Oregon objected to the incorporation of the City of Rajneeshpuram on what had been a ranch. A number of other objections under the land use laws were reviewed in prior decisions.[1] In the last of these decisions, this court remanded the present issue to LUBA with instructions to determine whether the incorporation election was invalid on grounds that the county judge improperly participated in setting the election, with prejudice to substantial rights. *1000 Friends of Oregon v. Wasco County Court,* 299 Or 344, 376, 703 P2d 207 (1985). The issue was carefully considered on remand and well briefed by the parties, resulting in the opposing conclusions stated by LUBA, over a dissent, and by the Court of Appeals.

LUBA's findings of fact may be summarized as follows. On two occasions when Cantrell visited the ranch, representatives of its residents, the petitioners for incorporation, told him that they were interested in buying cattle. Cantrell by letter offered to sell cattle to the ranch, asking prices somewhat higher than the prevailing market prices. He told his fellow commissioners of the intended sale but did not make it

---

[1] *See 1000 Friends of Oregon v. Wasco County Court,* 299 Or 344, 703 P2d 207 (1985); *1000 Friends of Oregon v. Wasco County Court,* 68 Or App 765, 686 P2d 375 (1984), *modified* 299 Or 344, 703 P2d 207 (1985); *1000 Friends of Oregon v. Wasco County Court,* 67 Or App 418, 679 P2d 320, *withdrawn on rehearing in banc,* 68 Or App 765, 686 P2d 375 (1984); *1000 Friends of Oregon v. Wasco Co. Court,* 62 Or App 75, 659 P2d 1001, *rev den* 295 Or 259, 668 P2d 381 (1983).

public. The representatives of the ranch accepted Cantrell's offer at his asking price. They decided to do so because they "needed him," and they consciously kept the transaction "low key" in order not to embarrass Cantrell. They also overlooked certain irregularities in the quality, weighing and transportation of the cattle, which LUBA found to have no significance for its decision. LUBA concluded:

> "In sum, the evidence is that the sale was irregular in some respects. Overall, the sale reflects an eager buyer, i.e., one who was less concerned with obtaining the best bargain possible than with meeting the requirements of the seller. The buyers and their associates may have believed this transaction would improve their chances of favorable treatment concerning the incorporation and related proceedings. There is no proof, however, that the transaction was expressly contingent on Cantrell's vote of November 4, 1981. Indeed, the evidence does not show any discussion at all between Cantrell and the cattle purchasers about the incorporation petition then pending before the county. Nor do we find that the transaction was so one-sided as to constitute a sham or an implicit 'pay-off' for his vote. Thus, we conclude petitioners have not carried the burden of proving disqualifying bias."

LUBA also considered whether the county board's decision was tainted by Cantrell's failure publicly to disclose his private dealings with the proponents of the incorporation. The majority opinion observed that the facts did not meet Oregon's statutory definition of a "potential conflict of interest," ORS 244.020(4), because the effect of the incorporation decision would not be to Cantrell's private benefit or detriment, and in any event, the government ethics law expressly provides that an official's failure to disclose a potential conflict of interest shall not lead to invalidating the official's action by a "court." ORS 244.130(2). That term does not necessarily preclude reversal by higher or subsequent agency action; however, the LUBA majority found no legal basis to set aside Cantrell's vote, and therefore the county board's decision, on grounds of his undisclosed communications with the proponents concerning matters that did not bear on the proposed incorporation vote.

Chief Referee Kressel, dissenting, did not expressly disagree with the majority's findings of fact. He concluded, however, that the proponents had attempted to gain Cantrell's

support by economic pressure, and that the cattle deal was sufficiently likely to have influenced his vote to require Cantrell's disqualification under Oregon law and the due process requirement of the federal constitution.

In reversing LUBA's affirmance of the county board's action, the Court of Appeals held that LUBA's findings of fact were supported by substantial evidence. Implicitly exercising judicial review for procedural error, ORS 197.850(9)(a), as our remand directed, the court held the action was "quasi-judicial" under the criteria of *Strawberry Hill 4 Wheelers v. Benton Co. Bd. of Comm.*, 287 Or 591, 601 P2d 769 (1979), and therefore required decision by impartial board members under *Fasano v. Washington Co. Comm.*, 264 Or 574, 507 P2d 23 (1973), and *Commonwealth Corp. v. Casualty Co.*, 393 US 145, 89 S Ct 337, 21 L Ed 2d 301 (1968), both of which the court believed to be based on federal due process requirements.

Concerning the first premise, LUBA found that the local district attorney advised the county commissioners that they had no legal authority to deny a proper petition for an incorporation election, though they could alter the proposed boundaries, and that Judge Cantrell believed that he had no choice but to vote for an election. (Cantrell's title as county "judge" has no bearing on the nature of the board's decision; *see generally Strawberry Hill 4 Wheelers, supra*, 287 Or at 594-602 (discussing history and operation of county "courts").) Without pursuing the question here, we shall accept the assumption that a county board's decision on a petition for an election to incorporate a city is "quasi-judicial," because we agree with the LUBA majority that even so, the decision need not be set aside on the facts found by LUBA.

## OREGON LAW

We reach constitutional issues only after determining whether a case can be decided on other legal grounds, because a constitutional holding places the issue beyond the ordinary lawmaking process. *See, e.g., Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 564-65, 687 P2d 785 (1984) and cases there cited. *Fasano v. Washington Co. Comm., supra*, the first case on which the Court of Appeals relied, did not cite the 14th amendment or Supreme Court

doctrines interpreting "due process of law." As explained in a later decision written by the author of *Fasano,* that holding rested on legislation which required county zoning to conform with a comprehensive plan, thus making certain types of zoning decisions dependent on "fact finding and the application of general policy as embodied in the comprehensive plan to a discrete situation * * *." Those decisions, were, therefore, "quasi-judicial rather than legislative in nature." *Neuberger v. City of Portland,* 288 Or 155, 159-60, 603 P2d 771 (1979). This legislative scheme "implied" certain safeguards characteristic of adjudicative procedure. *See id.* at 161; *Strawberry Hill 4 Wheelers,* 287 Or at 603.

The main holding in *Fasano* itself concerned burdens of proof and the scope of judicial review of local zone changes. *See* 264 Or at 586-88, 507 P2d 23. The court considered it appropriate to add some procedural guidance for future cases, specifically that parties at county board hearings "are entitled to an opportunity to be heard, to an opportunity to present and rebut evidence, to a tribunal which is impartial in the matter—i.e., having had no pre-hearing or ex parte contacts concerning the question at issue—and to a record made and adequate findings executed." *Fasano,* 264 Or at 588, 507 P2d 23 (citation omitted).

In using "i.e." in the quoted sentence, *Fasano* did not mean to imply that only pre-hearing or ex parte contacts could destroy the required impartiality; obviously, selfdealing and various types of bias also would do so. But *Fasano* did clearly state that board members must maintain impartiality only toward the parties and issues "in the matter," not toward all individuals and all competing interests in the community generally, and similarly, that the disqualifying contacts must be "concerning the question at issue." The "matter" and the "question at issue" here concerned the proposal to incorporate Rajneeshpuram. LUBA concluded from the evidence that the proponents may have been eager to make a cattle deal with the county judge, but that alone does not make their dealings with Cantrell a disqualifying contact.

 The Court of Appeals first quoted from *Commonwealth Corp. v. Casualty Co., supra,* that "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias,"

393 US at 150, *quoted in* 80 Or App at 539, and the court continued: "Cantrell should have disclosed his dealings with the ranch officials, and, having failed to do so, was disqualified to sit on the petition for the incorporation election." 80 Or App at 539. This leaves unclear whether the Court of Appeals thought that nondisclosure of facts, but not disclosure of facts, produces an "appearance of bias." In any event, *Fasano* did not go beyond a standard of actual impartiality to demand that board members in quasijudicial procedures maintain the appearance of impartiality required of judges.[2] The prefix "quasi," we recently said in another context, "means that a thing is treated as if it were something it resembles but is not." *State ex rel Eckles v. Woolley*, 302 Or 37, 45, 726 P2d 918 (1986). The quasijudicial decisions of local general-purpose governing bodies resemble, or should resemble, adjudications in important respects that bear on the procedural fairness and substantive correctness of the decision, but in other respects these bodies remain more "quasi" than judicial. Their members are politically elected to positions that do not separate legislative from executive and judicial power on the state or federal model; characteristically they combine lawmaking with administration that is sometimes executive and sometimes adjudicative. The combination leaves little room to

---

[2] Oregon Supreme Court, Code of Judicial Conduct, Canon 2 provides:

**"A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities.**

"A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

"B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness."

Canon 3 provides, in part:

**"C. Disqualification**

"(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

"(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

"* * * * *

"(c) he knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding * * *."

demand that an elected board member who actively pursues a particular view of the community's interest in his policymaking role must maintain an appearance of having no such view when the decision is to be made by an adjudicatory procedure. Also, the members of most governing bodies in this state serve part-time and without pay, making their livings from the ordinary pursuits and private transactions of their communities. Restrictions on permissible business activities and sources of outside income imposed on judges for the sake of appearance do not apply by analogy to such board members.

■ The distinction between two types of "bias," prejudgment and personal interest, is illustrated by *McNamara v. Borough of Saddle River*, 60 NJ Super 367, 158 A2d 722 (1960). There neighboring residents had fought the conversion of a large residential property into a private school, obtaining enactment of a restrictive ordinance and joining in litigation to enforce the restriction. One of the leaders of the protesting homeowners was elected to the borough council, where he voted to impose space requirements on schools that would further restrict possible enrollment of a school at the disputed site. The New Jersey court held that the councilman's vote required invalidation of this ordinance, not because of his prior political and legal battles to block the proposed school, but because his strong personal interest as a nearby homeowner impaired his ability to vote objectively "in the interest of the citizens at large." 60 NJ Super at 378.

■ However we might decide that case, it involved an actual, not an apparent, personal interest. That, in fact, may also be true of the vote invalidated in *Swift v. Island County*, 87 Wash 2d 348, 552 P2d 175 (1976), in which an officer of a lending institution participated as a county commissioner in approving a development that could indirectly benefit his company. The Washington court, however, went beyond the commissioner's actual interest and set aside the vote of approval for "lacking an 'appearance of fairness.' " 87 Wash 2d at 361. The court continued:

> "This doctrine has been developed to preserve the highest public confidence in those governmental processes which bring about zoning changes or which formulate property use and land planning measures. * * * It is the possible range of mental impressions made upon the public's mind, rather than the intent of the acting governmental employee, that matters.

> The question to be asked is this: Would a disinterested person, having been apprised of the totality of a board member's personal interest in a matter being acted upon, be reasonably justified in thinking that partiality may exist? If answered in the affirmative, such deliberations, and any course of conduct reached thereon, should be voided."

*Id.* (citations omitted). There also are dicta about "public confidence" as a reason for disqualifying members of zoning boards in *Mills v. Town Plan & Zoning Commission,* 144 Conn 493, 134 A2d 250 (1957), in which the court cited nothing beyond "public policy" for this and the decision rested on actual conflicts of interest, and in *Fail v. LaPorte Cty. Board of Zoning Appeals,* 171 Ind App 192, 355 NE2d 455 (1976), in which a statute disqualified board members "directly or indirectly interested in a financial sense" and the decision was against disqualifying a member who had occasionally bought equipment from the applicant for a zoning variance. We find no basis in Oregon law for imposing the test of "appearance" stated by the Washington court in *Swift.*

■ We do not minimize the value of evident as well as actual objectivity and disinterestedness in governmental decisions. Its importance is recognized in the government ethics law, ORS chapter 244, and elsewhere. Lawmakers have chosen to promote confidence in official probity by means of periodic disclosure of specified economic interests by state officials. ORS 244.050 to 244.110. The requirement extends to local officials if local voters so choose. ORS 244.160 to 244.201. The law also requires public officials to announce potential conflicts of interest before acting in the matter involving the potential conflict. ORS 244.120 to 244.130. Beyond these disclosure requirements, ORS 244.040 proscribes the actual use of an official's position or office to obtain financial gain for the public official or for closely associated persons. *See Davidson v. Oregon Government Ethics Comm.,* 300 Or 415, 712 P2d 87 (1985). The Oregon Government Ethics Commission is responsible for enforcing the statute against officials, as it did in *Davidson,* but the statute does not prescribe the effect of a violation on the official's action. ORS 244.350 to 244.390.

If actual bias or self-interest will invalidate an official's action, at least quasijudicial action, a prophylactic rule invalidating action for "lacking an 'appearance of fairness,' " *Swift v. Island County, supra,* may seem merely a desirable

further step toward the same goal. That is not necessarily so. Of course, a reviewing body may find it less painful to order reconsideration of an official's action for insufficient respect for appearances than to determine whether the official in fact acted under the influence of bias or self-interest. But the two standards serve different interests. Actual impartiality protects the substantive quality of the official action as well as the parties' interest in its fairness. Invalidation for appearance alone, as the *Swift* court said, aims to preserve public confidence, and it does so regardless whether the decision in fact was both correct and fair. The price of such invalidation is delay of what, but for appearances, is a proper application of public policy, at potentially heavy cost to an innocently successful proponent as well as to the agency.

Public confidence in judicial institutions is given such priority over efficiency even in a fairly and correctly decided case.[3] Even for decisions of elected boards that, as we have said, are more "quasi" than judicial, this priority for public confidence may be the desirable choice. But it is not a choice for this court to impose in the name of public policy. The contrary choice of policy toward appearances alone is implied by the provision in Oregon's governmental ethics law against invalidating actions for failure to disclose a potential conflict of interest, ORS 244.130(2).

## DUE PROCESS

The Court of Appeals believed that Cantrell's participation tainted the county board's vote on the incorporation petition for failure to meet federal standards of due process under the 14th amendment. The court dealt with a preliminary question whether petitioners could make this claim by holding that they had a "property interest" (though

---

[3] Standards for disqualification of judges are set forth in several places. 28 USC § 455, which applies to federal judges, provides in part:

"(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

The Code of Judicial Conduct of the American Bar Association, Canon 3(c), is identical to Oregon's Canon 3(C), *supra* note 2. Notice that Canon 3(c) is not by its terms limited to a judge's adjudicative acts.

For an extensive discussion of this statute and canon, *see* 13 A Wright, Miller & Cooper, Federal Practice & Procedure §§ 3541, 3549; *see also* sources cited *id.* at § 3541, 548-49 n 1.

not a conventional one) covered by *Board of Regents v. Roth,* 408 US 564, 92 S Ct 2701, 33 L Ed2d 548 (1972), in their state-granted right to ensure compliance with the land use laws. We are less confident that the United States Supreme Court would so characterize petitioners' interest. But once petitioners qualified as "aggrieved" persons under ORS 197.830(2)(b) or 197.830(3)(c)(B) to invoke LUBA's review at all, this review could reach an institutional failure of due process toward anyone's "property interests," as long as petitioners' "substantial rights" were prejudiced thereby. ORS 197.835(8)(a)(B). We therefore consider the 14th amendment claim.

■ The Court of Appeals wrote that a "decision on the merits by an adjudicator with a personal interest in the outcome is a violation of due process," noting that this "rule applies to administrative as well as judicial adjudications." 80 Or App at 538. In support of these propositions, the court cited *Ward v. Village of Monroeville,* 409 US 57, 93 S Ct 80, 34 L Ed 2d 267 (1972); *Tumey v. Ohio,* 273 US 510, 47 S Ct 437, 71 L Ed 749 (1927); *Gibson v. Berryhill,* 411 US 564, 578-579, 93 S Ct 1689, 36 L Ed 2d 488 (1973); *Withrow v. Larkin,* 421 US 35, 95 S Ct 1456, 43 L Ed 2d 712 (1975); and *Commonwealth Corp. v. Casualty Co., supra.* The general proposition is unexceptionable, though it rather grandly passes over the key question what kind of interests are distinctively "personal" and how directly they must be at stake in the outcome.

In *Tumey,* which originated this line of cases, the personal interest was financial and immediate: The compensation of the adjudicating officer (a mayor) included the costs assessed against those defendants whom he found guilty. An equally direct financial gain from the fines of convicted offenders was involved in *Ward,* with the significant difference that the income went to village operations for which the mayor was responsible rather than to himself. Also these cases involved classic adjudications, decisions that an individual had violated a law; there was nothing "quasi-judicial" about them.

*Gibson v. Berryhill, supra,* found a denial of due process when optometrists working for a corporate employer were penalized for "unprofessional conduct" by a state board of optometry composed of independent practitioners, who, according to the trial court's findings, would gain financially

along with other private practitioners from driving the corporation out of business. 411 US at 571. The tribunal in *Gibson* was an administrative board applying a professional licensing law, but as in *Tumey,* the holding rested on the board members' personal financial gains from the substance of the decision at issue. *Id.* at 579. *Withrow v. Larkin,* cited with "*see also*" by the Court of Appeals, concerned disqualification of medical board members for alleged bias and prejudgment rather than for self-interest, and the Supreme Court saw no want of due process when members adjudicated a violation after conducting the preceding investigation.

Finally, the Court of Appeals considered the "case closest to this one on its facts" to be *Commonwealth Corp. v. Casualty Co., supra,* from which it quoted the proposition that "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." 393 US at 150, *quoted in* 80 Or App at 539. In *Commonwealth Corp.,* the Supreme Court invalidated an arbitration of a contract dispute under the United States Arbitration Act because the prevailing party earlier had employed the firm of the neutral member of the arbitration panel, who in fact had performed services on the projects involved in the dispute, and neither the prevailing party nor the arbitrator had disclosed this to the other party. We are not persuaded that the quoted generalization will stretch from that context to invalidate under the 14th amendment a county commissioner's vote under circumstances like the present.

Justice Black's opinion stated the issue to be "whether elementary requirements of impartiality taken for granted in every judicial proceeding are suspended when the parties agree to resolve a dispute through arbitration." 393 US at 145. Referring to "the close financial relations that had existed between [the arbitrator's firm and the prevailing party] for a period of years," the opinion expressed "no doubt that if a litigant could show that a foreman of a jury or a judge in a court of justice had, unknown to the litigant, any such relationship, the judgment would be subject to challenge." *Id.* at 148. Disclosure of even a small financial interest was said to be required under the arbitration law because it is a constitutional principle "in the case of courts." *Id.* In short, the role of the arbitrators in *Commonwealth Corp.,* or at least of the supposedly neutral member, was more "judicial" and less

"quasi," more that of a "tribunal permitted by law to try cases and controversies" (a phrase drawn from the definition of federal *judicial* power under article III of the United States Constitution), than the role performed by the Wasco County commissioners in deciding whether to approve an election on the petition to incorporate the City of Rajneeshpuram.

The cases do not easily yield a single, simple rule, but it seems that 14th amendment standards for disqualification tighten with three separate variables: first, the more the officer or agency purports to act as a court (*Tumey, Ward*); second, the closer the issues and interests at stake resemble those in traditional adjudications, (*Commonwealth Corp.*); and third, as the disqualifying element moves from appearances through possible temptation and generic self-interest (*Gibson*) to actual personal interest in the outcome of the decision (*Tumey*). In the present case each element is at the low end of the scale.

■ In sum, the disagreement between the LUBA majority and the dissenting member was whether due process required Cantrell's disqualification because his sale of cattle to proponents of Rajneeshpuram on favorable terms was likely to have predisposed him to support their petition. Neither found that Cantrell gained anything from voting to submit the incorporation petition to an election. Without reaching any issue of disqualification for actual bias, the Court of Appeals held that Cantrell's failure to disclose his dealings with the proponents sufficed under the 14th amendment to disqualify him from voting. That holding pushes general propositions from cases involving courts, administrative adjudications and arbitrations further than we think the United States Supreme Court would go in a decision of this kind. As the factfinding agency, LUBA here found that Cantrell was not disqualified by financial interest or actual bias in favor of the proponents. We agree with LUBA that there is no legal basis for invalidating the decision of the Wasco County commissioners.

The decision of the Court of Appeals is reversed, and LUBA's order is affirmed.