# IN THE OREGON TAX COURT

## CONNECTICUT GENERAL LIFE INSURANCE COMPANY

*v.*

## DEPARTMENT OF REVENUE

(TC 3249)

Timothy O'Rourke, Corey, Byler, Rew, Lorenzen & Hojem, Pendleton, represented plaintiff.

Joseph Laronge, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered June 21, 1993.

## CARL N. BYERS, Judge.

Plaintiff appeals the true cash value of its property for the years 1987 through 1990. The property's unusual background merits discussion.

The subject property is a portion of a large cattle ranch in Eastern Oregon known for many years as the Big Muddy. Only 19,185 of the Big Muddy's 64,178 acres are in Wasco County; the remaining acreage is in Jefferson County. For over 100 years the Big Muddy was a cattle ranch. In September, 1980, it was sold to North Plains Land & Investment Co., Inc. (North Plains), for $2.4 million. On July 10, 1981, plaintiff loaned $3.5 million to North Plains and took a mortgage on the Big Muddy. Immediately thereafter, North Plains sold the Big Muddy for $6 million to the Rajneesh Foundation International (Rajneesh)[1] and the property became known as Rancho Rajneesh.

The Rajneesh did not purchase it for use as a cattle ranch but as a place to establish a religious commune. The followers of the Bhagwan Shree Rajneesh (Bhagwan) were incredibly successful. Between 1982 and 1985, they created the City of Rajneeshpuram which, at its peak, had about 3,000 permanent residents. They erected approximately 275 buildings, including offices, a shopping mall, restaurants, a school, industrial buildings, a two and one-half acre assembly hall, a motel, warehouses and numerous types of residential units. In addition, they created an infrastructure of streets, street lights, power substation, water and sewage systems, a

---

[1] Rajneesh is used throughout this opinion to refer to the religious group and the various legal entities which owned or controlled the property.

water reservoir, fire station, lighted airstrip, air terminal, bus stops, and other improvements. The total original investment in labor and capital is unknown. However, in 1986 the depreciated replacement cost was estimated at $61,385,000.

Sadly, like most other utopian efforts, snakes appeared in the Garden of Eden. Disputes between the Rajneesh and the neighbors resulted in many lawsuits.[2] The commune also experienced internal strife, resulting in most of the prominent leaders leaving. After the Bhagwan left, the commune rapidly dissipated. Initially, the Rajneesh tried to sell the property for about $40 million. It later listed the property with a Portland realtor for $28.5 million. In December, 1988, plaintiff began foreclosure proceedings. During 1989, plaintiff authorized a Bend realtor to show the property for $6 million. Plaintiff eventually sold the Big Muddy in June, 1991, for $3,650,000.

This appeal concerns only a small portion of the Big Muddy, namely, the 2,119 acres constituting the primary location of the commune.[3] Although the Wasco County Assessor has many accounts for the Big Muddy, plaintiff appealed only the 11 accounts containing the Rajneesh improvements. The dispute between the parties concerns the value of those improvements.

During the time the Rajneesh improvements were being constructed, the land was not zoned. Although the Rajneesh voted to incorporate the city and zone the land for

---

[2] *In Re Grand Jury Subpoena Served Upon Niven*, 784 F2d 939 (9th Cir 1986); *Byron v. Rajneesh Foundation Intern*, 634 F Supp 489 (D Or 1985); *State of Or. v. City of Rajneeshpuram*, 598 F Supp 1217 (D Or 1984); *State of Or. v. City of Rajneeshpuram*, 598 F Supp 1208 (D Or 1984); *In Re Rajneesh Neo-Sannyas Intern. Commune*, 59 Bankr 49 (Bkrtcy D Or 1986); *1000 Friends of Oregon v. Wasco Co. Court*, 304 Or 76, 742 P2d 39 (1987); *Rajneesh Foundation v. McGreer*, 303 Or 139, 734 P2d 871, 303 Or 371, 737 P2d 593 (1987); *Rajneesh Medical Corp. v. Wasco County*, 300 Or 107, 706 P2d 948 (1985); *Perkins v. City of Rajneeshpuram*, 300 Or 1, 706 P2d 949 (1985); *1000 Friends of Oregon v. Wasco County Court*, 299 Or 344, 703 P2d 207 (1985); *State ex rel Reid v. Frohnmayer*, 93 Or App 444, 763 P2d 733 (1988); *1000 Friends of Oregon v. Wasco Co. Court*, 80 Or App 525, 723 P2d 1039 (1986); *1000 Friends of Oregon v. LCDC*, 76 Or App 46, 708 P2d 1147 (1985); *City of Rajneeshpuram v. LCDC*, 76 Or App 55, 708 P2d 1152 (1985); *1000 Friends of Ore. v. Deva*, 64 Or App 755, 669 P2d 1183 (1983); *1000 Friends of Ore. v. Wasco Co. Court*, 62 Or App 75, 659 P2d 1001 (1983).

[3] The county appraisal indicates that there are 3,816.45 acres under appeal. Since the value of the land is not the source of the dispute, the court does not view the disparity in acreage as significant.

urban use, both the incorporation and the zoning were challenged and eventually voided. As a result, during the years in question, there was great uncertainty as to what legal uses could be made of the improvements. Wasco County issued citations for zoning violations but took no action on those citations.

The zoning uncertainty was only partially resolved in 1992 when the Wasco County Comprehensive Plan was acknowledged. That plan zoned the subject property for exclusive farm use.

Both the present and the prior directors of the Wasco County Department of Planning and Economic Development testified for defendant. One testified that it was "reasonably probable" and the other testified that it was "highly probable" that the owner could obtain approval of some conditional uses. However, they both acknowledged that there was strong public opposition to any use other than agricultural. The present director testified that the property could be used for a private school, camp or destination resort. The prior director testified it could be used as a rural service center. He also, however, acknowledged that it was "100 percent certain" that any proposed use other than agricultural would result in appeals.

The appraisers for the parties approached the valuation issue from disparate points of view. Plaintiff's main appraiser viewed the primary issue as one of highest and best use. Defendant's appraiser viewed the issue as whether there was an "immediate market" and, therefore, whether the test was to be the amount that would justly compensate the owner for loss.

## PLAINTIFF'S APPRAISAL

■ Highest and best use may be defined as:

"[T]he reasonably probable and legal use of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." Appraisal Institute, *The Appraisal of Real Estate* 45 (10th Ed 1992).

Based on this definition, plaintiff's appraiser analyzed the subject property by considering each of the four

"legs" of the definition separately. The court will likewise separately consider each "leg."

(a)  *Legally permissible.*

■        In considering what uses were legally permissible, the appraiser considered the many lawsuits which had occurred, the open public opposition to any use other than agricultural and the statewide interest in the property by groups such as 1000 Friends of Oregon. The appraiser concluded that it was not "reasonably probable" that any use other than agricultural would be approved. While defendant's witnesses and professional planners disputed this, the court agrees with the appraiser. After his purchase in 1991, the new owner explored the possibility of obtaining a zone change and making use of the many improvements. He sought a recreational-institutional zone. The owner hired a consultant, public relations people and attorneys. He met with strong resistance and, after spending over $100,000, gave up.

The commune's notoriety attracted widespread interest. The planners testified that during the years in question a number of inquiries were made with regard to possible uses of the property. Although there were many lookers, there were no takers. The court finds that it was not reasonably probable that the improvements could be used for other than agricultural use.

(b)  *Physically possible.*

■        The appraiser seems to conclude that it was not physically possible to use the properties for other than agricultural use. The court finds otherwise. This test is one of "possible" uses, not probable. Clearly, the improvements could physically be used for other than agricultural use because they were used in that manner for two years. No major physical modifications or alterations would be required to use the shopping mall as a shopping mall.

(c)  *Appropriately supported.*

■        The appraiser found that nonagricultural use was not appropriately supported. Although the property had been highly publicized and exposed on the market for a substantial period of time, no investors came forward to make commitments for the property. The appraiser concluded there was no

demand in the market for this property. The court agrees. The remote site at the end of 12 miles of dirt road, away from any major population center, makes any uses other than agricultural unsupported. All cultural and social forces applicable to the marketplace are contrary to establishing an urban use in this location. The improvements were located here only because of a religious group's choice.

(d) *Financially feasible.*

■ The appraiser viewed the land as a cattle ranch consistent with its use for the past 100 years. Because the improvements are inconsistent with that use, he found they contribute little or no value. The court agrees. What is feasible is determined by the market. In this remote area with a sparse population and no particular scenic or natural attributes such as mountains or lakes, it does not appear any nonagricultural use could be made of these improvements that would be financially feasible. More important, participants in the market apparently were unable to find financially feasible uses for the improvements.

■ After considering all of the factors which make up the concept of highest and best use, the court finds that the highest and best use of the subject property is agricultural. Plaintiff's appraiser correctly found this highest and best use leaves little or no value to most of the improvements. This situation is not unique. There have been many other small towns or developments abandoned when the main industry ceases. Whether it is the abandonment of a uranium mine or a military installation, the result is the same. One of the examples testified to by plaintiff's witness is the government radar station near Condon. That station had thirty residential buildings as well as a number of other buildings. When it sold, it sold for speculative value at a small fraction of its cost.

**DEFENDANT'S APPRAISAL**

Defendant's main appraiser viewed the dispute between the parties as turning on the method of valuation to be used. ORS 308.205[4] provides:

> "True cash value of all property, real and personal, means the market value of the property as of the assessment date.

___

[4] All citations to the Oregon Revised Statutes and the Oregon Administrative Rules are to the 1989 Replacement Part.

True cash value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue and in accordance with the following:

"(1)  *If the property has no immediate market value, its true cash value is the amount of money that would justly compensate the owner for loss of the property.*

"(2)  If the property is subject to governmental restriction as to use on the assessment date under applicable law or regulation, true cash value shall not be based upon sales that reflect for the property a market value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions." (Emphasis added.)

Defendant's appraisal report does not contain a discussion of highest and best use. The appraiser testified that the highest and best use for improvements was other than agricultural but gave no explanation to support his conclusion. He testified that the property is not subject to a typical highest-and-best-use analysis because of the "unusual situation." This required him to look at possible uses. His approach yields less than a satisfactory beginning point for an appraisal.

The appraiser considered the market evidence "unreliable." The court has major concerns with the appraiser's analysis. For example, he viewed the 1981 sale to the Rajneesh as "more valid" than the 1991 sale. This conclusion is not based on logic or market considerations. The 1981 sale involved the Big Muddy Ranch *prior to* construction of the Rajneesh improvements. In contrast, the 1991 sale included all of the improvements and may be some indication of how the market viewed their potential use. None of the evidence submitted would support a $6 million value for the Big Muddy without those improvements. Moreover, when the appraiser reached his conclusion, he was unaware of the 1980 sale to North Plains at $2.4 million. Once informed of that sale, he declined to change his opinion even though the timing and differences in sale prices certainly make the second sale questionable.

As additional support for his view, the appraiser cites unconsummated offers and the "stated" consideration in a

foreclosure sale. *Id.* He also cites an intercorporate transfer between the Rajneesh corporations. While the appraiser is absolutely correct that all of this information is unreliable, its use by him to support his view is equally untenable. The 1981 sale occurred eight and one-half years before the last assessment date at issue while the 1991 sale occurred only four and one-half years after the earliest date at issue. Although the 1991 sale occurred long after the assessment dates in question, the evidence showed the market was relatively stable during those four years. Consequently, the court has difficulty understanding the appraiser's rationale. Defendant's appraisal report, in referring to the 1991 sale, does state:

> "If that sale were taken as a valid market indicator, as plaintiff argues, it indicates a zero market value for the improvements * * *."

## LOSS TO THE OWNER

■ The concept of "loss to the owner" applied by defendant's appraiser merits some discussion. As indicated in an earlier case, "loss to the owner" is a market value.

> "In the court's view, the statute is simply saying that if there is no immediate market, then the value of the property is to be estimated using a method other than the sales comparison approach. The value sought by those other methods, however, whether the income approach or cost approach, is nevertheless the value in exchange or market value." *Truitt Brothers, Inc. v. Dept. of Rev.*, 10 OTR 111, 114 (1985), *aff'd* 302 Or 603, 732 P2d 497 (1987).

As a hypothetical to illustrate the error of defendant's position, assume the Rajneesh had paid $5 million to an artist to create a giant purple flag to drape the hills surrounding the commune. In the absence of any "immediate market," ORS 308.205 assumes the flag has a value to the Rajneesh of $5 million. Certainly, if Wasco County used the power of eminent domain to acquire ownership of the hills and the flag, the Rajneesh should be compensated $5 million for the flag, which is the amount necessary to restore their position. However, in terms of spiritual or aesthetic benefits, they might derive more or less than $5 million of satisfaction from such a flag. Since spiritual and aesthetic values are not measurable by the marketplace, the cost to the Rajneesh

would be the only reasonable means of estimating the giant purple flag's value for property tax purposes.

However, if the Rajneesh abandoned the commune and plaintiff, as a mortgage holder, became its unwilling owner, what is the flag's value? It would be illogical to attribute any spiritual or aesthetic benefits of a giant purple flag on a hill to an insurance company. In such a case, the only value that can be established for the giant purple flag is the value that the marketplace would place on the flag. A sheepherder might be able to adapt the flag for use in the place of some fencing or it might be sold to a publicity agent and hung from a bridge over the Columbia River. It is obvious, however, that such uses would be worth substantially less than the $5 million the Rajneesh paid to create the flag.

Defendant's error here is attributing to plaintiff the value which the Rajneesh placed on the improvements. Plaintiff is not a religious commune. It would not spend $65 million to build a city far removed from a population base. The only value to plaintiff is the value of any financial benefits that can be derived from the improvements. Defendant has not shown evidence of any such benefits. To the contrary, defendant's own witnesses, the county planners, indicated that a number of people inquired about potential uses for the property, but none took action. Given the totality of the circumstances, it seems that no financially feasible use, other than as a ranch, could be made of the property.

The court has additional concerns with defendant's appraisal. The adjustment of 25 percent per year was only a speculative guess at best. Defendant's appraiser did not perform an income approach because the property produced a loss while held by plaintiff. Yet defendant's OAR 150.308.205-(A)(2)(g) states:

"The income to be utilized in the Income Approach shall be the economic rent that the property would most *probably command in the open market* as indicated by current rents being paid, and asked, for comparable space." (Emphasis added.)

Defendant's appraiser concluded that the 1991 sale was "under duress." The reasons he gave were: (1) the seller was not a "typical seller," although he was unable to explain

what a typical seller is; (2) the owner "had to pay the taxes or lose the property," which is true of any property owner; and (3) plaintiff is a "financial institution" and the property had a negative cash flow. There was no evidence that plaintiff was unable to continue to carry the property. None of these facts indicate a duress sale.

## CONCLUSION

As plaintiff's counsel stated, this case is a "Field of Dreams" in reverse. The Rajneesh came, built a city in an isolated location and then left. After they left, the property received nationwide attention. It was exposed on the market for over five years and attracted many interested parties. Many potential investors investigated and some of them made offers, but none were consummated. With this kind of exposure, if there were uses that would justify a value of $9 million, let alone $19 million, they would have been implemented. This conclusion is reached with assurance because the market was alive, alert and working.

Undoubtedly, plaintiff would have been happy to have been outbid at its mortgage foreclosure sale. It appears it would have accepted less than $5 million for the property. This is shown by the original offer made by Boone Enterprises, Inc. (later succeeded by Hanover Investment Corporation) of $5 million in 1990. The Hanover Investment Corporation later renegotiated the purchase price to reduce it to $3,500,000 plus $980,000 in back taxes or a total of $4,480,000. This "potential purchaser" paid approximately $400,000 to keep the option open for almost one year. Yet, it forfeited that $400,000 rather than proceed with the transaction. This kind of evidence is a clear message from the market that the market saw no viable use for the extensive improvements.

The preponderance of the evidence supports plaintiff's position. Accordingly, the court finds that the true cash value of the property as of January 1, 1987, through January 1, 1990, is $436,000. Plaintiff to recover its costs and disbursements.