MULTNOMAH COUNTY,
a home rule subdivision of
the State of Oregon,
by and through its Tax Collector,
Janice Druian,
and its Tax Assessor,
Robert Ellis

*v.*

DEPARTMENT OF REVENUE

*and*

GLACIER PARK CO.,
*Intervenor*
(TC 3485)

Sandra N. Duffy, Multnomah County Office of County Counsel, represented plaintiffs.

No appearance by defendant.

Jack L. Orchard, Ball, Janick and Novack, Portland, represented intervenor.

Decision for defendant rendered May 3, 1994.

**CARL N. BYERS, Judge.**

Plaintiffs appeal from defendant's Opinion and Order No. 91-0140, which reduced the assessed value of intervenor's property for 1988, 1989 and 1990. This appeal concerns the effect of government regulation on the highest and best use of property.

The subject property consists of approximately 420 acres of undeveloped land northwest of Portland. It is bordered on the west by the Burlington Northern railroad track and on the east by the Multnomah Channel of the Columbia River. The parcel is in the shape of a large slug on the railroad with the river flowing over its back. It is approximately 9,000 feet long, 700 feet wide at the "tail" and 2,600 to 2,800 feet wide at the widest point. The property is mostly flat low-lying land and contains several lakes or marshes.

The property is zoned Multiple Use Agriculture with a 20-acre minimum lot size (MUA-20).[1] Although outside the urban growth boundary, it is only 12 minutes by car from downtown Portland. This rural location makes it highly desirable for residential development, particularly if the development has access to or a view of the river.

The central issue is the highest and best use of the property.

Highest and best use is defined as:

"[T]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." Appraisal Institute, *The Appraisal of Real Estate* 275 (10th ed 1992).

Plaintiffs contend that the highest and best use of the subject property is residential development, while intervenor contends it is open space.

---

[1] "The purposes of the Multiple Use Agriculture District are to conserve those agricultural lands not suited to full-time commercial farming for diversified or part-time agriculture uses; to encourage the use of nonagricultural lands for other purposes, such as forestry, outdoor recreation, open space, low density residential development and appropriate Conditional Uses, when these uses are shown to be compatible with the natural resource base, the character of the area and the applicable County policies." Multnomah County, Or Code § 11.15.2122.

A thorough discussion of all of the government regulations and restrictions concerning the use and development of the subject property would unduly extend this opinion. Consequently, the court will mention only the major points:

(1) Residential development in a MUA-20 zone is a conditional use. Application for such use requires a public hearing and the decision is discretionary with the governing body.

(2) Because of the physical characteristics of the property, it must be developed as a planned development, an additional layer of government regulation.

(3) The property is subject to a Willamette River Greenway overlay. This regulatory scheme is superimposed over normal zoning in order to protect the natural scenic qualities of land in particular areas.

(4) The property is in a flood hazard zone, which regulates development and use of properties subject to flooding.

(5) The greatest portion of the land is classified as wetlands or emerging wetlands. Use or development of such lands requires permission of the Division of State Lands and the United States Corps of Engineers under overlapping federal and state laws.

(6) Development would require access to Highway 30, which involves the Oregon Department of Transportation, and obtaining permission or access from the railroad to cross the railroad right-of-way.

(7) State and federal agencies concerned with fish and wildlife might become involved depending upon the type and extent of development.

Despite these many layers and complexities of government regulation, plaintiffs contend the land can be developed and has a true cash value reflective of that potential. As envisioned by plaintiffs' appraiser, a planned development of clustered houses located on an upland area would be the highest and best use. Clustering would permit compliance with the 20-acre minimum lot size without encroaching into the wetland areas. Plaintiffs' appraiser also believes that

(1) water is available from a privately-owned water district; (2) the development could use sand filter septic systems for sewage; (3) the wood trestle bridge is adequate for car traffic; and (4) residences could be constructed on either engineered fill or built high enough (over garages) to meet floodplain requirements.

Plaintiffs recognize that residential development is a conditional use involving significant effort to obtain permission for development. Plaintiffs' appraiser estimated it would cost approximately $100,000 just for the process. After estimating the cost of the sand filter septic systems at $500,000, the appraiser estimated the total development costs for 20 sites at approximately $1,000,000. If developed, he believes that each site would have a market value between $190,000 and $300,000.

Using this analysis, plaintiffs' appraiser concluded the highest and best use of the property was for residential development as clustered homesites. Based on this conclusion, he estimated the property had a market value of $1,040,000 for each of the three years in question.

Plaintiffs' appraiser also used three market sales but the court finds those sales were not comparable. Two of the sales were in the state of Washington and plaintiffs' appraiser did not know the zoning for those parcels. Intervenor's appraiser testified that with regard to all of plaintiffs' sales, each property had some portion which was clearly available for a higher and better use other than open space or residential use.

Intervenor argues there are so many permits required it is likely some permits would expire before an applicant could obtain approval for all of them. Intervenor does not believe all the necessary approvals could be obtained. Even if possible, intervenor's appraiser estimated the cost of obtaining government approval between $300,000 and $400,000.

Intervenor also asserts that plaintiffs' highest and best use analysis is based on speculation rather than facts. For example, intervenor points out that plaintiffs' appraiser admitted he did not evaluate whether sand filter septic systems could be used on the subject property. Intervenor

argues the soil type involved is one of the poorest kinds for septic systems and is not likely to be approved. In addition, traffic for 20 houses would require major improvements to the road and bridge. The trestle bridge on the property, which is in need of repair, is located between two wetlands. This location poses physical as well as legal obstacles to the repairs. Furthermore, plaintiffs' appraiser acknowledged the road appears to be seven feet below the floodplain, requiring significant fill before it could be improved.

Intervenor also disputes the availability of water for 20 houses. Intervenor's witness testified that the privately owned water district could handle one or two additional houses, but not 20. Furthermore, if a water line had to cross the wetland area, additional permission would be needed from the Division of State Lands or the Corps of Engineers.

Intervenor's land use expert witness testified it was highly "improbable" that the subject land could be developed. Plaintiffs' land use expert believed it was feasible, but was not sure it was probable. He acknowledged that any developer would have to expect opposition from conservation groups. He also acknowledged: (1) there are many points requiring government approval, (2) many of the decision points are discretionary, and (3) refusal on any single point would block development.

■ Plaintiffs' appraiser admitted he did not know the extent of risk involved with regard to disapproval by any of the government agencies. He stated he did not think the risk of nonapproval influenced the property's highest and best use or its value. This is clearly contrary to the principles of true cash value. As this court stated in *Cox v. Dept. of Rev.*, 12 OTR 535 (1993):

> "Property which is subject to governmental restrictions making it necessary to obtain a zone change or variance before it can be developed will be discounted by the market. This discount will reflect the expense, time, risk, inconvenience and other problems involved in obtaining the government authorization." 12 OTR at 538.

Clearly, this principle is applicable in the present case.

The court finds the preponderance of the evidence supports intervenor's position. Plaintiffs made insufficient investigation to establish a foundation for their highest and best use conclusion. Plaintiffs' appraiser did not give adequate consideration to the costs involved in obtaining governmental permission. As intervenor's witness indicated, the subject property would be a developer's nightmare involving biologists, surveyors, engineers, lawyers, consultants, planners, and others. Furthermore, in the current political climate, any development proposal would draw opposition. Since many of the issues are discretionary, it is likely a developer could not obtain all of the necessary approvals.

Plaintiffs' appraiser referred to houses in the Johnson Creek floodplain area which have overcome some of the hazards of flooding by building a garage below the living area. While this solution may be adequate for homes in the $135,000 to $150,000 range, in this case the plaintiffs' projected value of the sites would be $190,000 to $300,000 each. Intervenor's appraiser testified that residences developed on sites of this value would be in the range of $1,000,000. There is no evidence to indicate that the market would support clustered homes of such quality and price. Moreover, plaintiffs' appraiser "had no idea" how close such homes would have to be to each other in order to fit on the upland area.

Plaintiffs ask the court to reach a conclusion that does not square with the realities of the marketplace. While plaintiffs point to the fact that the property was offered for sale at $2,000,000, they ignore the fact that the market did not respond. Inasmuch as it is the market that determines value, how the market responds to property offered for sale is significant. Plaintiffs believe that the property, which had a maximum price of $2,000,000, could be developed for $1,000,000 and result in a value of $4,000,000 to $6,000,000. This potential for profit is so great that it is unlikely that the knowledgeable marketplace would simply ignore the property, which it did.

While plaintiffs acknowledge that the property sold in May 1991 for $350,000, they give it little credence because they do not believe the sale was an arm's-length sale. This implies the owners did not try to maximize their return from the property, an inference that runs counter to human

nature and counter to the evidence submitted. The owners had the property evaluated for its development potential by an experienced consultant. The consultant engaged engineers to look at the site and discussed it with the very county planner testifying for plaintiffs. After study and evaluation, the consultant recommended that the property be sold. It is interesting to note that the property was offered as a "sportsman's retreat," not as property having development potential.

In summary, plaintiffs' appraiser came to a conclusion of highest and best use which is not consistent with the property's experience in the marketplace. In such circumstances, any projected highest and best use must be supported by market data as well as a detailed analysis. *See, Connecticut General Life Ins. Co. v. Dept. of Rev.*, 12 OTR 461 (1993).

Based on all of the evidence, the court finds the true cash value of the subject property as of January 1, 1988, January 1, 1989, and January 1, 1990, was $350,000.

Department's Opinion and Order No. 91-0140 is affirmed. Intervenor to recover costs and disbursements.