DECISION
Plaintiff appeals the Lane County Board of Property Tax Appeals Order, dated February 17, 2010, reducing the real market value of property identified as Account 0688299 (subject property) for tax year 2009-10. A trial was held in the Oregon Tax Courtroom, Salem, Oregon on February 8, 2011. David Sohm (Sohm), Registered Appraiser 3, Lane County Assessment and Taxation, appeared and testified on behalf of Plaintiff. David E. Carmichael, Attorney at Law, appeared on behalf of Defendants. Donald Gwyther (Gwyther), ASA, testified on behalf of Defendants.
Plaintiff's Exhibit 1 and Defendants' Exhibit A were received without objection.
 I. STATEMENT OF FACTS
The subject property is a 115.47 acre parcel of land located in Lane County, west of Highway 99 and northwest of Hampton Road. (Ptf's Ex 1 at 7.) In his testimony, Sohm described the subject property as "less than five miles from the heart of Eugene." He concluded that the subject property's location creates "synergy with the metro area, creating demand that supports other uses." Sohm wrote that "[d]ue to the location and size, the physically possible legal use of the vacant site that would produce the highest value as of January 1, 2009 is estimated to be industrial development." (Ptf's Ex 1 at 11.) Gwyther testified that he agrees *Page 2 
that, if the subject property was vacant, then "its highest and best use would be industrial use." The parties agree that the neighborhood is "a mix of rural residences and industrial uses" including a former sawmill, log truck yard, offices, maintenance facilities, a lumber wholesaler, manufacturing, and two auto recyclers. (Defs' Ex A at 30.) Gwyther testified that "[t]raditionally, this area has been dominated by the wood products industry. It has been noted that auto recycling [] appears to be a growing industry in the area." (Id.) Sohm wrote that the current improved "use is consistent with the zoning[.] * * * [T]he existing use presents a physically possible, legally permitted, and financially feasible use of the property and is concluded to be representative of the highest and best use of the property as improved." (Ptf's Ex 1 at 10.) Sohm testified that the "current use is a reflection of the historical use." Gwyther testified that the highest and best use as improved of the subject property is "sawmill/chipping mill."
The subject property is "improved with a mill facility and includes a 3 acre pond." (Id. at 7) "The improved portion of the site with rocked yard area in the vicinity of the mill buildings is 750,000 square feet or about 17.2 acres.[1] A railroad spur track serves the mill site. There are drainage channels and areas of wetlands on the site, in addition to the three acre pond." (Id. at 8.) Gwyther testified that potential "hydrocarbon contamination" on the subject property warrants "further investigation." (Defs' Ex A at 36.)
Sohm testified that, in valuing the subject property as of January 1, 2009, the "market did not recognize the depth of the recession." He reviewed the statutory definition of real market value, the statutory requirement to include site development costs in land values and the three *Page 3 
approaches of valuation. Sohm testified that he used the sale comparison approach even though the sales were "limited in number." He reviewed each of the five sales and two listings he selected as comparable to the subject property. (Ptf's Ex 1 at 13-22.) Sohm explained that he selected the two listings because there are few "large sites" in the immediate area like the subject property and one listed property had "a drainage channel and was low lying" like the subject property. Defendants pointed out that both listings were after the assessment date of January 1, 2009. Sohm testified that those listings reflect "recession." All of Sohm's comparable sales were located "in a small area north of Eugene," with the exception of one sale in the Junction City area. Gwyther testified that the location of Sohm's comparables sales, specifically Awbrey Lane and Airport Road, is a different "market than Goshen," where the subject property is located. He testified that Goshen does not have an airport, there is "not now and has not been any major development," and there "are no ties to the west Eugene community." Gwyther testified that west Eugene is "an established area with roads, curbs, and regular shaped parcels that are highly desirable."
The parcel size of Sohm's comparable sales ranged from 2 acres to 35 acres. Sohm concluded that "a value at the low end of the range is reasonable * * * at * * * $26,136 per acre." (Id. at 16.) Even though Sohm determined a real market value of $3,018,000 using the sale comparison approach, Sohm testified that Plaintiff's requested real market value is $1,654,280. (Id.) Sohm testified that because of location and proximity he "really believes" that the subject property's value is "higher than BOPTA" and "it needs to be recognized." He stated that, in 2006, the property owner built a "$1 million mill" on the subject property, making "the land worth more." In response to questions, Sohm testified that he did not inspect the comparable *Page 4 
sales properties and those properties he selected as comparable are located "10 to 15" or more miles from the subject property.
Gwyther testified that in looking for comparable sales he found that there was "little demand for rural industrial mill site." He testified that he used sales of "similar properties in Douglas County, Linn County, and Polk County." (Defs' Ex A at 54.) Gwyther testified that he selected eight comparable sales, including the sale of the subject property dated June 14, 2004. (Id.) Most of Gwyther's comparable sales were improved properties, requiring an allocation of the sale price to land and improvements, and the date of sale ranged from February 2002, to June 19, 2007. (Id.) Sohm questioned Gwyther, asking why none of the comparable sale prices he selected were adjusted for time when, during the six year period represented by the sales, "there have been sufficient changes in prices in the Eugene area, ranging from 8 to 18 percent." In response to questions, Gwyther testified that, in determining the allocation of sale price to land and improvements, he "talked to a wide variety of people" and relied on his "experience as an insurance appraiser, having over the years seen a pattern of what people pay for these things." He testified that he "did not deduct all site improvements" from the sale price allocated to the land. Gwyther was asked to read the following from Sohm's appraisal report:
 "The market extraction procedure involves analysis of improved sales. * * * This technique is most applicable when
 • "The contribution of improvements to the total property value is generally small and relatively easy to identify. (The technique is frequently used in rural areas.
 • "The improvements are new, their value is known, and there is little or no depreciation from any causes."
(Ptf's Ex 1 at 12.) Sohm pointed out that, contrary to the above guidelines, the "contribution of improvements to total property value" was substantial, "10 to 73 percent," in many of Gwyther's comparable sales. *Page 5 
Gwyther testified that all of the comparable sales occurred "when higher prices were paid for most real estate and those higher prices do "not necessarily translate to rural industrial properties [because] mill sites did not ride the tide" of the real estate boom followed by the current fiscal downturn. He testified that there "is not enough demand for" mill properties. Gwyther testified that the "most significant" sale was comparable sale 3, the sale of the subject property. That was "followed" by comparable sale 4, dated February 21, 2003, a "former veneer" facility located on a 21.46 acre parcel in Creswell close to the freeway with a railroad track and "similar terrain as the subject property" and by comparable sale 8, dated February 18, 2002, a 10 acre unimproved parcel located "adjacent to the subject property." Sohm pointed out that, for the subject property, "there was a subsequent deed for $1,440,000 in March 2005 when a one-half interest was granted to Wiley Mountain, Inc. with the other half granted to Babcock Properties." (Ptf's Ex 1 at 8.) Gwyther testified that that transaction was "not an arm's length transaction, but a transaction between partners in the sawmill." Gwyther answered numerous questions about the comparable sales, noting that five of the comparable sales "were close to the subject property" and four "not so close."
Gwyther testified that "[i]n general, there is a very limited market for this type of property, especially as of the effective date of this appraisal." (Defs' Ex A at 72.) He testified "all of the sales except Sale 7 and 8 required allocations for items other than land, including buildings, site improvements, machinery and equipment." (Id.) Gwyther testified that, in determining the real market value of the subject property, he "broke down" the value based on the characteristics of the land "underneath the improvements." Gwyther concluded "the fee-simple, Real Market Value as of January 1, 2009, for [the subject property] was $550,000." (Id.) *Page 6 
 II. ANALYSIS
The issue before the court is the 2009-10 real market value of the subject property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments."Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [2] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."
A. Highest and Best Use
The subject property is land. Land valuation is directly related to highest and best use analysis. Appraisal Institute, TheAppraisal of Real Estate 361 (13th ed 2008). Highest and best use is defined[3] as:
 "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value."
Id. at 278. A highest and best use analysis assists the appraiser to "interpret[] the market forces that affect the subject property and identify[y] the use or uses on which the final opinion of value [should be] based." Id. at 139. "An appraiser determines the highest and best use of property by / / / *Page 7 
weighing market demand for the uses, products or services the property is designed to provide. That analysis focuses on the uses to which a property can most profitably be put." STC Submarine,Inc. v. Dept. of Rev. (STC Submarine), 13 OTR 14, 18 (1994).
Both Sohm and Gwyther concluded that the highest and best use for the subject property as vacant was industrial use. Sohm concluded that the highest and best use would be industrial development without specifying the uses associated with the development. He supports his conclusion, stating that "[d]ue to the location and size, the physically possible legal use of the vacant site that would produce the highest value as of January 1, 2009 is estimated to be industrial development." (Ptf's Ex 1 at 11.) Sohm does not present evidence in support of his conclusion other than the five comparable sales. "Highest and best use is not determined by ascertaining whether there are market transactions indicating a demand for a property. That analysis is too general. Rather, it is `[t]hat reasonable and probable use that will support the highest present value as of the date of the appraisal.'" STCSubmarine, 13 OTR at 18 (citation omitted). "[A]ny projected highest and best use must be supported by market data as well as a detailed analysis." Multnomah County v. Dept. of Rev.,13 OTR 58, 64 (1994) (citation omitted). Sohm did not present an economic study "weighing market demand for the uses, products or services the property is designed to provide." STC Submarine,13 OTR at 18. There is a lack of evidence comparing Sohm's generic industrial use to the subject property's current industrial use, including the cost to maintain the improvements or cure items of deferred maintenance, if any. There is no consideration of the cost to demolish or remodel the existing improvements. *Page 8 
In contrast, Gwyther concludes, as does Sohm, that the highest and best use of the subject property as improved is the continuation of its current use. Both appraisers' reports reach the same conclusion. (Ptf's Ex 1 at 11; Defs' Ex A at 52.) There is no evidence that the subject property's current industrial use does not represent its "highest present value." STC Submarine. 13 OTR at 18. There was no evidence that the current use was not viable and there is evidence that the subject property's use could continue.
In determining whether the subject property's highest and best use is its current use, the first considerations are the tests of physical possibility and legal permissibility. Both parties agree that the subject property is zoned RI, Rural Industrial, and that Rural Industrial permits a number of industrial uses. The subject property's current use is legally permissible. (Ptf's Ex 1 at 10; Defs' Ex A at 51.) Both parties agree that utility services, including water, electricity and natural gas, are available and there are no topographical or other significant natural obstacles preventing industrial development or continuing the subject property's current use. The subject property's current use is physically possible.
There is no evidence showing that the value of the subject property as presently improved is less than the value of the subject property as unimproved. Gwyther testified that the current use was not the highest and best use from a "practical" point of view. He concluded that the subject was not restricted to the function for which it was built, but could be used as a light industrial building or as a distribution warehouse. There is no evidence that those uses are the highest and best uses, rather than lower and lesser uses. Valuing the subject as a light industrial building could result in a lower value, not a higher value, especially when the age and condition *Page 9 
of the improvements are considered. There is inadequate evidence for the court to conclude that the subject property's highest and best use as vacant is greater than its improved use. Based on the evidence presented, the court finds that the highest and best use of the subject property as improved is its current use as a mill or similar industrial use.
B. Valuation of Land
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. See ORS 308.205(2); OAR 150-308.205-(A)(2). In a case such as the one before the court, the comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant."Chambers Management Corp and McKenzie River Motors v. Lane CountyAssessor, TC-MD No 060354D at 6 (Apr 3, 2007), citing Appraisal Institute, The Appraisal of Real Estate 335 (12th ed 2001).
Sohm relied on the comparable sales approach, stating that "[d]ue to the number of sales of similar industrial land in the relevant market area this approach is applicable to the subject warehouse with office." (Ptf's Ex 1 at 13.) He identified five sales as comparable. None of the sale prices was adjusted to the assessment date. Comparable sales 1 and 2 are parcels significantly smaller than the subject, comparable sale 3 was not confirmed, and the comparable sales 4 and 5 may not be arm's length given the "assemblage motivation" of the buyers. Defendant challenged the location of all of Sohm's comparable sales. Sohm presented two listings, one dated December 2008 and the other dated April 2010, to support his indicated value. Listings are generally recognized as the upper limit for most completed sale transactions. *Page 10 
In determining the subject property's real market value, Sohm ignored the chipping operation. Sohm's approach is contrary to ORS 308.235 which provides, in pertinent part, that:
 "(1) Taxable real property shall be assessed by a method which takes into consideration:
 "(a) The applicable land use plans, including current zoning and other governmental land use restrictions;
 "(b) The improvements on the land and in the surrounding country and also the use, earning power and usefulness of the improvements, and any rights or privileges attached thereto or connected therewith; and
 "(c) The quality of the soil, and the natural resources in, on or connected with the land, its conveniences to transportation lines, public roads and other local advantage of a similar or different kind."
There is no evidence he considered "the use, earning power and usefulness of the improvements." Id. Further, Sohm's method ignores the "contributory value of the existing improvements and any possible alteration of those improvements are also important in determining the highest and best use and, by extension, in developing an opinion of the market value of the property." TheAppraisal of Real Estate at 278.
C. Burden of Proof
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. Plaintiff must establish its claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept. of Rev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. ofRev., 4 OTR 302 (1971)). The court finds Plaintiff's evidence in support of its indicated value insufficient with respect to highest and best use and lacking in comparability to the subject property. *Page 11 
 III. CONCLUSION
After careful review of the evidence and testimony, the court concludes that Plaintiff failed to carry its burden of proof. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.
Dated this _____ day of June 2011.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Presiding Magistrate Jill A.Tanner on June 7, 2011. The Court filed and entered this documenton June 7, 2011.
[1] Gwyther states that "[a]pproximately 19.5-acres make up the plant site and access road. About 8-acres, west of the main plant site, have had various amounts of fill material and rock applied recently, and is being used primarily for `bone yard' storage of surplus equipment, but may allow for some future expansion of the main plant site." (Defs' Ex A at 49.)
[2] References to the Oregon Revised Statutes (ORS) are to year 2007.
[3] Oregon Administrative Rule 150-308.205-(A)(1), entitled Real Property Valuation for Tax Purposes, states that:
 "(e) `Highest and best use' means the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value. See The Appraisal of Real Estate, 12th edition (2001)." *Page 1