## COLUMBIA RIVERKEEPER
and NW Property Rights Coalition,
*Respondents,*

*v.*

## CLATSOP COUNTY,
*Respondent,*
*and*

## OREGON PIPELINE COMPANY, LLC,
*Petitioner.*

Land Use Board of Appeals
2010109; A157374 (Control)

## OREGON PIPELINE COMPANY, LLC,
*Petitioner*
*Cross-Respondent,*

*v.*

## CLATSOP COUNTY,
*Respondent*
*Cross-Petitioner,*
*and*

## COLUMBIA RIVERKEEPER
and NW Property Rights Coalition,
*Respondents.*

Land Use Board of Appeals
2013106; A157375

341 P3d 790

E. Michael Connors argued the cause for petitioner-cross-respondent. With him on the briefs was Hathaway Koback Connors LLP.

Jeff Bennet argued the cause for respondent-cross-petitioner. With him on the brief were Timothy V. Ramis and Jordan Ramis PC.

Lauren R. Goldberg and Brett VandenHeuvel filed the brief for respondents.

Before DeVore, Presiding Judge, and Haselton, Chief Judge, and Garrett, Judge.

DEVORE, P. J.

**DEVORE, P. J.**

Oregon Pipeline Company, LLC (OPC) petitions for review of two decisions of the Land Use Board of Appeals (LUBA) that relate to OPC's application for land-use approvals from Clatsop County for a 41-mile segment of a natural gas pipeline. In November 2010, the Clatsop County Board of Commissioners (the board)[1] approved the application, and parties that opposed the application appealed that decision to LUBA. Before the county provided the record to LUBA, the board—with three newly elected commissioners—voted to withdraw its approval and reconsider its decision. OPC challenged the board's withdrawal through a mandamus action in the circuit court. The circuit court dismissed the mandamus action, and we affirmed that dismissal on appeal. *State ex rel Oregon Pipeline v. Clatsop County*, 253 Or App 138, 288 P3d 1024 (2012), *rev den*, 353 Or 428 (2013). Thereafter, on reconsideration, the board denied OPC's application.

OPC appealed to LUBA, challenging the board's decisions to withdraw the approval and to deny the application. On appeal, LUBA rejected some of OPC's procedural challenges, but determined that Commissioner Huhtala, of the newly elected commissioners who had participated in the board's decisions to withdraw the approval and to deny the application on reconsideration, had demonstrated disqualifying bias against OPC's application. LUBA remanded the board's denial of OPC's application for a new reconsideration without the participation of Huhtala. LUBA did not reach the merits of the board's decision to deny the application.

OPC petitions for review of two LUBA final orders that relate to its application. The first LUBA decision, LUBA No. 2010-109, dismissed an appeal of the board's original decision to approve OPC's application. Wrapped up in that LUBA proceeding were issues related to the validity of the board's withdrawal of the November 2010 approval

---

[1] Although Clatsop County is a respondent in this matter, we refer alternatively to Clatsop County as "the board" and as "the county" depending on the context of the reference.

decision. The second LUBA decision, LUBA No. 2013-106, rejected a number of OPC's procedural challenges to the board's decision on reconsideration, but remanded that decision for reconsideration without the participation of Huhtala.

On review, OPC contends in its first assignment that, under ORS 197.835(10)(a)(B),[2] LUBA should have reinstated the board's original approval of the application because the county took actions after that approval that were "for the purpose of avoiding the requirements of ORS 215.427." In relevant part, ORS 215.427 requires a governing body to take "final action" on certain applications for a permit within 150 days.[3] In its second assignment, OPC contends that the "taint" of Huhtala's bias also applied to the board's decision to withdraw its approval decision and that LUBA should have remanded for the board to revisit that decision also. In its third assignment, OPC argues that the board's withdrawal of its approval decision was untimely. In its fourth and final assignment of error, OPC asserts that LUBA incorrectly rejected arguments that the three newly elected commissioners failed to properly disclose *ex parte* contacts that related to the application. The county cross-petitions for review of LUBA's decision remanding the county's decision, arguing that LUBA incorrectly determined that Huhtala was biased.

We reject OPC's first, third, and fourth assignments of error for the reasons given below. We agree with the county's contention in its cross-petition that LUBA incorrectly determined that OPC had proven Huhtala's actual bias, and we reverse that portion of LUBA's final

---

[2] ORS 197.835(10)(a) provides:

"The board shall reverse a local government decision and order the local government to grant approval of an application for development denied by the local government if the board finds:

"* * * * *

"(B) That the local government's action was for the purpose of avoiding the requirements of ORS 215.427 or 227.178."

[3] After providing a shorter time limit for certain decisions, ORS 215.427(1) provides, subject to exceptions, that "[t]he governing body of a county or its designee shall take final action on all other applications for a permit * * * within 150 days after the application is deemed complete * * *."

order in LUBA No. 2013-106. Because we agree with the county's cross-petition, we need not address OPC's second assignment. We remand to LUBA for further proceedings consistent with this opinion.

## I. BACKGROUND

We summarize the procedural history here and recount the facts about Commissioner Huhtala later when we reach the bias issue. In 2009, OPC filed an application for a land-use approval for a 41-mile segment of a natural gas transmission pipeline through Clatsop County.[4] After a public hearing process, a hearings officer approved the application subject to conditions of approval. Respondents Columbia Riverkeeper and NW Property Rights Coalition (collectively, "Columbia Riverkeeper") and other parties appealed the hearings officer's decision to the board. On November 8, 2010, the board issued a decision approving the application with conditions.

Columbia Riverkeeper appealed the board's approval decision to LUBA, and LUBA docketed that appeal as LUBA No. 2010-109.[5] Pursuant to statute, ORS 197.830(10)(a), and LUBA's administrative rule, OAR 661-010-0025(2), the county had until December 15, 2010, to transmit the record of the proceedings under review to LUBA. On December 14, 2010, the county moved for a thirty-day extension of time to transmit the record "due to an unusually large and voluminous compilation of the Record." The record would prove to be 11,754 pages. OPC did not object to the extension request, and LUBA, pursuant to its rule regarding extensions of time, OAR 661-010-0067, granted the county until January 14, 2011, to transmit the record.

Meanwhile, in May 2010, Lee, Huhtala, and Birkby had been elected to the board. They were sworn into office on January 12, 2011. That same day, in a 4-to-1 vote, the board decided to withdraw the November 2010 approval for

---

[4] The 41-mile segment is part of a larger liquified natural gas (LNG) project that proposes a terminal in the City of Warrenton and an associated natural gas pipeline through multiple jurisdictions.

[5] OPC moved to intervene in LUBA No. 2010-109 on December 15, 2010. LUBA later granted that unopposed motion.

reconsideration pursuant to ORS 197.830(13)(b).[6] The three new commissioners voted in favor of withdrawal. The next day, the county filed a notice with LUBA that it was withdrawing for reconsideration its November 8, 2010, decision. OPC objected, and LUBA allowed briefing on the issue by the parties. LUBA issued an order on February 17, 2011, concluding that the county could, pursuant to ORS 197.830(13)(b), withdraw its November 2010 decision in order to reconsider. LUBA also rejected OPC's contention that the county requested the time extension for the purpose of allowing the newly elected commissioners to take office and vote to withdraw the approval for reconsideration. Based on OAR 661-010-0021, LUBA granted the county 90 days to issue its decision on reconsideration. LUBA suspended the appeal in LUBA No. 2010-109 pending the county's decision on reconsideration.

The county set a public hearing for the board to reconsider the November 2010 decision. However, five days before the hearing, OPC filed a petition for writ of mandamus under ORS 215.429 with the Clatsop County Circuit Court, arguing that the county's withdrawal decision led to a violation of ORS 215.427 (requiring "final action" on OPC's permit application within 150 days after the application was complete), and arguing that OPC was entitled to approval of the application under ORS 215.429(5) (directing a court to issue a peremptory writ ordering the county to issue an approval unless the governing body proves that the approval would violate the comprehensive plan or land use regulations). Initially, the court issued an alternative writ, but vacated it two weeks later. In the meantime, the board proceeded with the public hearing and adopted a preliminary decision to deny OPC's application. When the board scheduled a meeting for March 30, 2011, to adopt a final written decision denying OPC's application, OPC petitioned for a writ of mandamus from the Supreme Court. The Supreme Court issued a preemptory writ ordering the circuit court to continue the mandamus proceeding and further ordering

---

[6] ORS 197.830(13)(b) provides, in part:

"At any time subsequent to the filing of a notice of intent and prior to the date set for filing the record, * * * the local government * * * may withdraw its decision for purposes of reconsideration."

the county to cease action until the mandamus proceeding was completed in the circuit court.

In June 2011, the circuit court entered a judgment dismissing OPC's petition for a writ of mandamus. OPC appealed that judgment, and we affirmed, concluding that the county's November 2010 approval decision constituted "final action" within the meaning of ORS 215.427. *Oregon Pipeline*, 253 Or App at 150. After the Supreme Court denied review of our decision, LUBA issued an order granting the county 90 days to complete the reconsideration process. The board held a public hearing on October 9, 2013, and voted to deny the application. On October 16, 2013, the board adopted a resolution and order that made its reconsideration decision final.

OPC appealed the board's decision to LUBA, challenging procedural aspects of the board's actions, along with several challenges to the substance of the board's denial. Accordingly, LUBA had before it the suspended appeal in LUBA No. 2010-109 and OPC's new appeal in LUBA No. 2013-106. On June 27, 2014, LUBA dismissed the appeal in LUBA No. 2010-109 because the original petitioners had not refiled their notice of intent to appeal or an amended notice of intent to appeal. *See* OAR 661-010-0021(5)(e) (providing that if a notice of intent to appeal is not refiled or an amended notice of appeal is not filed by the petitioner within the 21-day deadline established by OAR 661-010-0021(5), "the appeal will be dismissed").

That same day, LUBA rendered its decision in LUBA No. 2013-106, making several conclusions. LUBA first rejected OPC's argument that, under ORS 197.835(10)(a)(B), LUBA was required to reverse the board's decision and order the board to approve the application because the board allegedly took action to avoid the deadline requirement of ORS 215.427.

Second, LUBA examined OPC's contention that the three newly elected commissioners were biased and had prejudged the application, thus depriving OPC of an impartial tribunal as required by *Fasano v. Washington Co. Comm.*, 264 Or 574, 588, 507 P2d 23 (1973), disapproved on other grounds by *Neuberger v. City of Portland*, 288 Or 585, 607

P2d 722 (1980). LUBA concluded that the actions of one of the three commissioners—Huhtala—demonstrated bias and deprived OPC of an impartial tribunal. For that reason, LUBA remanded the board's decision that had denied OPC's application so that the board could reconsider the application without the participation of Huhtala. LUBA, however, declined to order the county to reconsider the board's earlier decision to withdraw the November 2010 approval despite Huhtala's participation in that vote. LUBA concluded that, given that the board had withdrawn the November 2010 approval, "the November 8, 2010 decision no longer exists and the county's January 13, 2011 decision to withdraw that now-nonexistent decision cannot be undone given the actions that have been taken following the January 13, 2011 withdrawal."

Third, LUBA rejected OPC's contention that the three newly elected commissioners limited their disclosure of *ex parte* contacts regarding OPC's application to the time frame after they took office, as opposed to anytime after OPC submitted the application in October 2009. LUBA explained that the record demonstrated that Birkby and Lee had not limited their disclosure of *ex parte* contacts to those that occurred only after taking office. As for Huhtala, LUBA did not address whether he had properly disclosed *ex parte* contacts because it had already concluded that he was biased against the application, and that, on remand, he could not participate in the board's consideration of the application.[7]

## II. ANALYSIS

On review, OPC raises four assignments of error, and the county, in its cross-petition for review, raises a single assignment of error. OPC first contends that LUBA erred in not reversing the county's reconsideration decision based on ORS 215.427 and ORS 197.835(10)(a)(B). Second, OPC asserts that LUBA should have directed the county to reconsider its January 2011 decision to withdraw its approval because Huhtala participated in that earlier vote. Third, OPC maintains that LUBA erred in concluding that

---

[7] LUBA also remanded to the county to allow OPC to respond to potentially new evidence in the local hearing upon reconsideration involving the Columbia River Resource Base maps. That ruling is not challenged on appeal.

the county's withdrawal of the November 2010 decision was timely and that LUBA was required to grant the county's request. Finally, OPC objects to LUBA's conclusion that the three newly elected commissioners had adequately disclosed *ex parte* contacts. The county's cross-petition asserts that LUBA incorrectly determined that Huhtala was biased and urges reversal of that portion of LUBA's final order in LUBA No. 2013-106.

We confine our review to the record and do not substitute our judgment for that of LUBA as to any issue of fact. ORS 197.850(8). We may reverse or remand the order on review if the order is unlawful in substance or procedure, but error in procedure is not cause for reversal or remand unless we find that substantial rights of the petitioner were prejudiced thereby. ORS 197.850(9)(a). We may also reverse or remand if the order is unconstitutional, or if the order is not supported by substantial evidence in the whole record as to facts found by LUBA under ORS 197.835(2). ORS 197.850(9)(b), (c).

A. *Are OPC's first three assignments of error reviewable?*

Before we address OPC's first three assignments of error, we must consider a preemptive argument from the county. The county contends that we cannot review OPC's assignments because the only opportunity for OPC to seek review of those issues should have been to appeal LUBA's February 17, 2011, order that determined that the county could withdraw for reconsideration the board's approval decision. As previously noted, after the board initially approved OPC's application in November 2010, Columbia Riverkeeper appealed that decision to LUBA. The county, on January 13, 2011, filed a notice of withdrawal of the approval decision for reconsideration. OPC objected, disputing the permissibility of a withdrawal. LUBA ruled that the county could, pursuant to ORS 197.830(13)(b), withdraw its approval decision for reconsideration. The county's argument assumes the premise that LUBA's February 17, 2011, order was a final and reviewable order under ORS 197.850. The county posits that, because OPC failed to seek review of that order, it is precluded in this proceeding from belatedly raising issues that were established in that order.

We reject the county's argument. Pursuant to ORS 197.850(1), any party to a LUBA proceeding may seek judicial review of a "final order issued in those proceedings." Although the statute does not define "final order," *see Beck v. City of Tillamook*, 313 Or 148, 152, 831 P2d 678 (1992), LUBA has promulgated an administrative rule, OAR 661-010-0070, which sets out the features of a "final order" within the meaning of ORS 197.850(1). The rule states:

> "(1)    An Order of the Board is final when the cover page of the order containing the caption of the appeal:

> "(a)    States 'Final Opinion and Order';

> "(b)    Indicates whether the decision being reviewed is affirmed, reversed, remanded, or whether the appeal is dismissed;

> "(c)    Contains the date of the final order; and

> "(d)    Is time and date stamped by the Board."

OAR 661-010-0070(1). The LUBA order that the county insists was a final and reviewable order—the February 17, 2011, order—lacks the first feature. That is, LUBA did not designate that order as "Final Opinion and Order." Instead, it simply stated "Order" on the cover page. The February order also lacks the second, substantive feature. It does not represent a "review" of the local decision that results in that decision being "affirmed, reversed, remanded, or the appeal being dismissed." Despite the withdrawal, LUBA retains jurisdiction, and, after local reconsideration, LUBA will later resolve the appeal of the revised local decision by affirming, reversing, remanding, or dismissing. *See* ORS 197.830(13)(b); OAR 661-010-0021. Accordingly, under the explicit terms of OAR 661-010-0070(1), which has not been challenged by the parties, the February 17, 2011, order was not a "final order" for purposes of ORS 197.850.

Here, LUBA's ultimate June 27, 2014, decision—not its earlier February 17, 2011, order—served as the "final order" in LUBA No. 2010-109. Despite the protestations of the county, LUBA did not issue a final order *before* June 27, 2014, in LUBA No. 2010-109 from which OPC could have sought review. The assignments that OPC now raises in relation to LUBA No. 2010-109 are not precluded.

B. *Does ORS 197.835(10)(a)(B) require reversal of the county's reconsideration decision?*

In its first assignment of error, OPC asserts that LUBA erred by rejecting OPC's argument that ORS 197.835(10)(a)(B) required reversal of the county's reconsideration decision. ORS 197.835 provides, in relevant part:

"(10)(a) The board shall reverse a local government decision and order the local government to grant approval of an application for development denied by the local government if the board finds:

"* * * * *

"(B) That the local government's action was for the purpose of avoiding the requirements of ORS 215.427 or 227.178."

Before LUBA, OPC asserted that the county took actions to avoid the requirement in 215.427(1) that the county "take final action" on OPC's application "within 150 days after the application is deemed complete." OPC pointed to two things: (1) the county's request for an extension of time to file the record in LUBA No. 2010-109 until a date after the newly elected commissioners were scheduled to take office and (2) the county's withdrawal of the November 2010 approval decision, a decision that allowed the newly elected commissioners to reconsider and deny the application "well after the 150-day deadline" had expired.

LUBA concluded that our decision in *Oregon Pipeline* supported the county's position that neither action identified by OPC could constitute an action to avoid the 150-day deadline because, in *Oregon Pipeline*, we held that OPC had already received "final action" on November 8, 2010, when the county approved OPC's application. LUBA explained that *Oregon Pipeline* established that the reconsideration process was not subject to the 150-day deadline. Although reconsideration could introduce delay, the county had taken final action, for purposes of the mandamus statutes, on November 8, 2010, as required by ORS 215.427(1). LUBA characterized the county's actions after November 8, 2010, as actions "taken to take advantage of the statutory right the county is granted * * * to withdraw its decision * * * for reconsideration."

On review, OPC contends that *Oregon Pipeline* does not decide the issue. OPC asserts that in *Oregon Pipeline* the court did not consider whether the avoidance issue of ORS 197.835(10)(a)(B) applies in the circumstances presented here; rather, the decision only addressed the "narrow jurisdictional issue" of whether, for purposes of ORS 215.427, the county had taken "final action" on November 8, 2010. By contrast, OPC contends that in this proceeding it was seeking a remedy for avoidance available under ORS 197.835(10)(a)(B) that was subject to LUBA's exclusive jurisdiction. Therefore, according to OPC, LUBA should have decided here whether the county actions complained of were taken for the purpose of avoiding the time requirements of ORS 215.427.

The differences between this case and *Oregon Pipeline* do not overcome the answer to a common question. In *Oregon Pipeline,* after LUBA allowed the county to withdraw its approval decision, OPC filed a petition for a writ of mandamu, as authorized by ORS 215.429, in which OPC sought to compel the county to approve its application. 253 Or App at 140. OPC argued that, because the county had withdrawn its decision, the county had failed to take any "final action" within 150 days as required by ORS 215.427. That argument presents the same question here. The county moved to dismiss the petition and the circuit court dismissed.

On appeal, we examined whether the county's November 2010 decision constituted "final action" under ORS 215.427. After surveying a number of cases that addressed whether final action had been taken by the local governing body, we explained that it was apparent that "the mandamus remedy was meant to require local governments to take 'final action' within a specified amount of time; when such action has been taken, the purpose of the mandamus statutes has been satisfied, and an aggrieved party must look to LUBA for further review." *Id.* at 147. We concluded that the county had not failed to comply with the time limits prescribed by the mandamus statute because "the county took 'final action' within the 150-day time limit; the circumstance that LUBA review of that decision, including the withdrawal and reconsideration process set out in ORS 197.830(13)(b), was available thereafter does not alter that

conclusion." *Id.* at 148.[8] We held that mandamus was not available to OPC because it had received a final action, in the form of the November 2010 approval, within the required 150 days.

As far as it goes, OPC is correct that in *Oregon Pipeline* we decided only that, for purposes of whether a mandamus remedy was available to OPC, the county's November 2010 decision was a "final action." By so concluding, we did not hold that a party is precluded from requesting the remedy provided in ORS 197.835(10)(a)(B) on appeal to LUBA of a local government's decision denying an application. Nevertheless, the decision is dispositive as to the application of ORS 197.835(10)(a)(B) in these circumstances. We concluded in *Oregon Pipeline* that (1) for purposes of the 150-day deadline the county took "final action" on November 8, 2010 and (2) the subsequent withdrawal and reconsideration process are distinct from ORS 215.427. Those conclusions, as a matter of logic, preclude the conclusion that actions taken by the board after the board has taken final action could be for the purposes of avoiding the 150-day deadline. Once the county has taken "final action" for purposes of ORS 215.427, subsequent actions by the county cannot logically be for the purpose of avoiding doing what it has already done. LUBA did not err in recognizing that our decision in *Oregon Pipeline* precludes a conclusion that actions taken after November 8, 2010, could be considered "for the purpose of avoiding the [150-day deadline] requirement[] of ORS 215.427."[9]

---

[8] We stated that

"[b]ecause the county took final action by issuing its decision on November 8, 2010, the circuit court lacked jurisdiction to adjudicate Pipeline's petition for a writ of mandamus in March 2011. When Pipeline filed that petition, the county's final decision had already been appealed to LUBA. Because the county's withdrawal of that decision for reconsideration did not divest LUBA of its exclusive jurisdiction over the appeal under ORS 197.825, the circuit court lacked jurisdiction to adjudicate Pipeline's petition for a writ of mandamus and properly granted the county's motion to dismiss."

*Id.* at 150.

[9] In the course of arguments on its first assignment of error, OPC renewed an argument seemingly different in character from the question of avoidance of a time limit. OPC asserts that ORS 197.830(13)(b) only allows a local government on reconsideration to correct any legal defects in the original decision and does not allow the local government to adopt an entirely new decision. We agree with LUBA that the statute does not place any substantive limitations on a local government's right to withdraw a decision for reconsideration, as long as it is within

C. *Did LUBA err in determining that the county's notice to withdraw its approval decision was timely?*

In its third assignment of error, OPC maintains that LUBA incorrectly determined that the county, on January 12, 2011, could withdraw its November 2010 approval for reconsideration under ORS 197.830(13)(b). ORS 197.830(13)(b) provides, in relevant part:

> "At any time subsequent to the filing of a notice of intent and prior to the date set for filing the record,* * * the local government or state agency may withdraw its decision for purposes of reconsideration. If a local government * * * withdraws an order for purposes of reconsideration, it shall, within such time as the board may allow, affirm, modify or reverse its decision."

LUBA determined that ORS 197.830(13)(b) "grants local governments a unilateral right to withdraw a decision that has been appealed to LUBA, and LUBA may not deny a timely request to withdraw a decision for reconsideration." LUBA concluded that the county's withdrawal request was timely because "the date set for filing the record" became January 14, 2011, when LUBA granted the county's 30-day extension request. According to LUBA, because the county filed its withdrawal request before January 14, 2011, the request was timely, and LUBA had no choice but to grant it.

On review, OPC challenges LUBA's determination that the county filed its notice of withdrawal before the "date set for filing the record." Citing to ORS 197.830(10)(a),[10] OPC contends the date set for filing the record was December 15, 2010, because that date fell 21 days after Columbia Riverkeeper filed its notice of intent to appeal in LUBA No. 2010-109. OPC maintains that ORS 197.830(10)(a) determines a single, fixed "date set for filing the record," and any extension of time granted by LUBA to file the record does not change that date for purposes of ORS 197.830(13)(b).

the time constraints identified in the statute. The statute allows the county to "affirm, modify or reverse its decision," and the county's decision on reconsideration was a permissible choice to reverse its original approval decision.

[10] In relevant part, ORS 197.830(10)(a) provides that, "[w]ithin 21 days after service of the notice of intent to appeal, the local government * * * shall transmit to the board the original or a certified copy of the entire record of the proceeding under review."

The county responds that LUBA had the authority to extend the date set for filing the record, that it did so in this case, and that the county's withdrawal notice was therefore timely under ORS 197.830(13)(b). The county argues that OPC's interpretation would insert the word "original" or "initial" before the phrase "date set for filing the record." Because LUBA adopted OAR 661-010-0067 to address motions for extension of time, the county contends that an extension of time to transmit the record also extends the time in which a local government can invoke reconsideration under ORS 197.830(13)(b).

The issue is framed by two statutes. As noted, ORS 197.830(13)(b) provides that a local government may withdraw its decision for purposes of reconsideration "prior to the date set for filing the record[.]" And, ORS 197.830(10)(a) provides, in relevant part, that "[w]ithin 21 days after service of the notice of intent to appeal, the local government * * * shall transmit to the board the original or a certified copy of the entire record of the proceeding under review." The issue becomes whether the 21 days referenced in ORS 197.830(10)(a) establishes the exclusive "date set for filing the record" for purposes of ORS 197.830(13)(b). In interpreting the legislature's intended meaning of "date set for filing the record" in ORS 197.830(13)(b), we consider the text, context, and any applicable legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

Taken together, the two provisions would establish the initial "date set for filing the record" under ORS 197.830(13)(b) in a case without extensions. *See Lane County v. LCDC*, 325 Or 569, 578, 942 P2d 278 (1997) ("[W]e do not look at one subsection of a statute in a vacuum; rather, we construe each part together with the other parts in an attempt to produce a harmonious whole."). Yet, the text of the statutes does not establish that the initial date set by ORS 197.830(10)(a) is the "exclusive date" set for filing the record in every case. Many cases may be routine with ordinary records. Some cases may be unusual with overwhelming records. This case involves a record of more than 11,000 pages.

The immediate purpose to be served from the time limit on withdrawal and reconsideration is apparent in ORS

197.830(13)(b). The provision for withdrawal and reconsideration opens the opportunity for the local body to eliminate confusion, clarify findings, change its decision, narrow disputed issues, or, in some instances, eliminate the need for appeal, when that can be done before the parties and LUBA have invested time and resources in the case. If the purpose of the provision is its benefit to the parties and the process, then the "date set for filing the record" is a pragmatic concern about avoiding wasted effort. There is no purpose served in a fixed date of 21 days from a notice of appeal. Subsection (13)(b) provides an opportunity to narrow or resolve issues and that purpose would appear to be less concerned with an arbitrary date.

When we consider ORS 197.830 within the context of the statutory scheme that grants LUBA broad authority to manage the proceedings before it, we conclude that an extension of time granted by LUBA to transmit the record also extends the time in which a local government can invoke reconsideration under ORS 197.830(13)(b). The plain text of ORS 197.830 does not conclusively establish that ORS 197.830(10)(a) sets the exclusive "date set for filing the record." Neither ORS 197.830(10)(a) nor ORS 197.830(13)(b) references the other as might be expected when the legislature intends a date set in one subsection to control in another subsection of the same statute. In one subsection, ORS 197.830(10)(a) contains an admonition that the local government transmit the record to LUBA within 21 days, while in another subsection ORS 197.830(13)(b) references the "date set for filing the record" without reference to a specific actor. That is, the "actor" setting the date in ORS 197.830(13)(b) could be the legislature in ORS 197.830(10)(a), or it could be LUBA. Without an explicit cross-reference in the statute, the more natural understanding of ORS 197.830(10)(a) is that LUBA is the party that sets the date for filing the record.

Given the context of ORS 197.830(13)(b) within the larger statutory scheme, we conclude that the legislature intended LUBA to be the actor that establishes the "date set for filing the record." That context is the legislature's grant to LUBA of broad authority to manage the proceedings before it, including extensions of time for filing the record. *See* ORS 197.820(4)(a) (directing LUBA to adopt rules governing

"[t]he conduct of review proceedings brought before it under ORS 197.830 to 197.845"). Pursuant to that authority, LUBA has adopted extensive rules addressing review proceedings. And, OAR 661-010-0067(3) provides that, other than extensions for a notice of intent to appeal and petitions for review, "[a]ll other time limits may be extended upon oral or written consent of all parties, the Board's motion or motion of a party." That context convinces us that the legislature did not intend to limit the "date set for filing the record" to the date initially set for transmitting the record under ORS 197.830(10)(a) or LUBA's equivalent administrative rule. Generally, ORS 197.830(10)(a) will establish the "date set for filing the record," but given the authority granted to LUBA to extend that time, we conclude that an extension of time to transmit the record also extends the time in which a local government can invoke reconsideration under ORS 197.830(13)(b). Therefore, LUBA did not err in concluding that the county's decision to withdraw its approval and to reconsider was timely.

D.  *Did LUBA correctly determine that Commissioner Huhtala was biased?*

Next, we address the county's cross-petition, in which it argues that LUBA incorrectly determined that Huhtala was biased. We begin with the principle first announced in *Fasano* that parties to a quasi-judicial land-use hearing are entitled to a "tribunal which is impartial in the matter." 264 Or at 588. As we will explain, that principle, when applied to these facts, becomes the question whether Huhtala demonstrated actual bias by prejudging the merits of OPC's application, thus destroying OPC's right to an impartial tribunal.[11]

---

[11] Impartiality can be destroyed in several ways, including acts of self-dealing, bias, and pre-hearing or *ex parte* contacts. *1000 Friends of Oregon v. Wasco Co. Court*, 304 Or 76, 81, 742 P2d 39 (1987), *cert den*, 486 US 1007 (1988). As for "bias," the court in *1000 Friends of Oregon* touched on the distinction between "two types of 'bias,' prejudgment and personal interest." *Id.* at 83. As for personal interest, the court indicated that where a vote on an issue before a tribunal would result in a pecuniary benefit to the decision maker, the decision maker's vote could be invalidated for self-interest. For our purposes, we are concerned only with prejudgment bias because that was the issue presented to LUBA. OPC did not allege that Huhtala stood to gain any pecuniary benefit from his participation in the matter, and OPC's contentions regarding *ex parte* contacts are analyzed separately.

### 1. *Impartiality arguments before LUBA*

Before LUBA, OPC asserted that, given the actions of the three newly elected commissioners, they were biased against OPC's application. To decide that issue, LUBA considered our decision in *Eastgate Theatre v. Bd of County Comm'rs*, 37 Or App 745, 588 P2d 640 (1978), which LUBA acknowledged set a "high bar" for disqualification of a local government decision maker in quasi-judicial land-use proceedings. LUBA compared a series of its own decisions on impartiality and noted that despite the high bar set for disqualification in *Eastgate*, LUBA's prior cases had determined that even in the face of a local official's claim that he or she could decide a matter impartially, in some instances, that claim was not credible given the nature and extent of the decision maker's prior actions.

LUBA concluded that statements made by Birkby and Lee during their campaigns for commissioner in 2010 were not sufficient to demonstrate bias in their votes to withdraw the November 2010 approval. None of the parties challenge that determination here. As for Huhtala, LUBA examined his actions beginning with his 2005 campaign for commissioner of the Port of Astoria through his 2010 campaign for Clatsop County Commissioner and concluded that, despite his statement that he would enter the hearing without preconception, remain unbiased, set aside his personal views, and base a decision upon the facts, the totality of his actions was "collectively clear and unmistakable evidence that Huhtala acted in this matter with actual bias."[12]

### 2. *The nature and scope of the* Fasano *impartial tribunal requirement*

In order to assess the correctness of LUBA's determination of actual disqualifying bias, we trace the nature and scope of the "impartial tribunal" requirement from its origins in *Fasano*. *Fasano* involved a writ of review proceeding where the petitioner had sought to have the court set

---

[12] One LUBA board member dissented. She would have concluded that, at most, the probative evidence showed an appearance of bias; thus, she would have denied OPC's bias challenge to Huhtala and proceeded to resolve the merits of the appeal. *Oregon Pipeline Company v. Clatsop County*, ___ Or LUBA ___ (LUBA No 2013-106, June 27, 2014).

aside a zoning change granted by the Washington County Commission. 264 Or at 577. The Supreme Court, on review, noted that the majority of jurisdictions treated zoning decisions as legislative acts that were entitled to a presumption of validity. *Id.* at 579. Nevertheless, the court noted that more jurisdictions had begun to recognize that such issues can take on an administrative or quasi-judicial nature. *Id.* at 580. Based on a preference for stricter judicial review, the court concluded that the determination whether the permissible use of a specific property should be changed is usually an exercise of judicial authority that is properly subject to a less deferential standard of review. *Id.* at 581. The court continued:

> "What we have said above is necessarily general, as the approach we adopt contains no absolute standards or mechanical tests. We believe, however, that it is adequate to provide meaningful guidance for local governments making zoning decisions and for trial courts called upon to review them. With future cases in mind, it is appropriate to add some brief remarks on questions of procedure. Parties at the hearing before the county governing body are entitled to an opportunity to be heard, to an opportunity to present and rebut evidence, *to a tribunal which is impartial in the matter*—i.e., having had no pre-hearing or ex parte contacts concerning the question at issue—and to a record made and adequate findings executed."

*Id.* at 588 (emphasis added). Impartiality was not explored. As the Supreme Court later recognized, the holding in *Fasano* concerned burdens of proof and the scope of judicial review of zoning changes. *1000 Friends of Oregon v. Wasco Co. Court*, 304 Or 76, 81, 742 P2d 39 (1987), *cert den*, 486 US 1007 (1988).

Two years after *Fasano*, we were faced with a challenge to the impartiality of two city council members who had discussed the merits of a comprehensive plan change with their constituents during a several-day break in the hearing on the issue. *Tierney v. Duris, Pay Less Properties*, 21 Or App 613, 629, 536 P2d 435 (1975). The applicant argued that the council members' discussions violated the requirement in *Fasano* against *ex parte* contacts. *Id.* at 628. We explained that *Fasano*'s "basic requirement is an impartial tribunal,"

and that *ex parte* contacts are just one way to compromise that requirement. *Id.* at 629. We concluded that *Fasano* was not violated where the contacts (1) were with disinterested persons, (2) amounted to an investigation of the merits of the proposed change, and "most importantly," (3) were made a matter of record so that the applicants had an opportunity to respond. *Id.*

Three years after that, in *Eastgate Theatre*, we decided that two county commissioners had taken *Fasano*'s impartial tribunal requirements "too literally" and had mistakenly disqualified themselves from voting on a comprehensive plan change. 37 Or App at 751. The petitioner in *Eastgate Theatre* had requested a change in the comprehensive plan map in Washington County. Two of five county commissioners had disqualified themselves from voting because of previous involvement with the matter in other capacities. The remaining commissioners voted 2 to 1 in favor of the plan change, but because the county charter required an affirmative vote by three commissioners for any action, the change failed. *Id.* at 749. The petitioner instituted a writ of review proceeding, and, at that proceeding, the trial court affirmed the county board's decision. On appeal, we determined that because the county board had failed to enter a proper order with findings and conclusions, the case had to be remanded for entry of such an order. *Id.* at 750.

When we addressed whether it was appropriate for the two abstaining commissioners to have disqualified themselves, we characterized the "impartial tribunal" requirement as "more hortatory than literal." *Id.* at 753. For a pair of reasons, we explained why the nature of quasi-judicial land-use proceedings requires a high bar for disqualification. *Id.* at 753. First, we observed that the consequences of disqualification in quasi-judicial land-use proceedings are greater than in judicial proceedings. *Id.* at 751. That is so because a judge, unlike an elected local official, can be replaced from the bench and the adjudication can go forward. The nonparticipation by a commissioner—who cannot be replaced—"is therefore a drastic step." *Id.* That problem is intensified when there is a minimum number of votes required for a decision because nonparticipation may have

the same affect as a "nay" vote. *Id.* Second, we described the differences between a judge and an elected local official:

> "A judge is expected to be detached, independent and non-political. A county commissioner, on the other hand, is expected to be intensely involved in the affairs of the community. He is elected because of his political predisposition, not despite it, and he is expected to act with awareness of the needs of all elements of the county, including all government agencies charged with doing the business of the people."

*Id.* at 752-53. Recognizing those differences, we stated that, "if the system is to work, impartiality must be defined and procedurally accommodated differently in quasi-judicial proceedings than in judicial proceedings." *Id.* at 753.

Both commissioners had felt compelled by *Fasano* to abstain because of their involvement with other government bodies that were interested in the use to which the petitioners' property was put. One board member had served as chairman of a community-planning organization that had studied and unanimously recommended approval of the proposed plan change. In his capacity, he had expressed his view that the plan change was the best use of the property. *Id.* at 748, 748 n 2. Another member had served as the director of a service district that had expressed an interest in acquiring the parcel at issue as a site for a transfer station. *Id.* at 748, 748 n 3.

> "Neither situation posed the kind of partiality which the Supreme Court intended in *Fasano* to prohibit. Indeed, abstention in this case, although it flowed from an abundance of good faith, was a corruption of the goal of *Fasano*.
>
> "The goal of the *Fasano* procedures is that land-use decisions should be made fairly. The abstention in this case did not prevent partiality; instead, it prevented the decision itself. *Fasano* cannot be applied so literally that the decision-making system is aborted because an official charged with the public duty of adjudication fears that his motivation might possibly be suspect."

*Id.* at 753-54. We explained that the impartial tribunal requirement was intended by the *Fasano* court to counteract the "dangers of the almost irresistible pressures that can

be asserted by private economic interests on local government." *Id.* at 754. Given the nature of the proceedings and the expected political predisposition of elected local officials, that previous involvement with the matter before the board as members of other government organizations did not demonstrate bias. *Id.* at 754. We concluded that *Fasano* was not intended to guard against official involvement in community planning and unrelated governmental activities. It was intended to insulate decisions from private economic interests. Accordingly, "the conflicts which the commissioners declared as the basis for their refusal to vote are not of the kind which *Fasano* was intended to guard against." *Id.*

The Supreme Court revisited aspects of *Fasano* in *1000 Friends of Oregon*, a decision that underscores the opponent's need to prove an official's "actual bias." 304 Or 76. The case involved a vote by the Wasco County Board to call an election on a proposal to incorporate a portion of a former ranch as the City of Rajneeshpuram. *Id.* at 78. 1000 Friends of Oregon, which opposed the election, had objected to the participation of one county board member on the basis that he was not impartial. The board member had visited representatives of the ranch prior to the vote, and the representatives had informed him that they were interested in buying cattle from him. *Id.* at 78-79. The board member offered to sell them cattle at prices that were somewhat higher than prevailing market prices, and the ranch representatives accepted his offer at the asking price because they "needed him." *Id.* at 79. There were other "irregularities" about the sale. The board member did not make the transaction public, and the ranch representatives consciously kept the transaction "low key" so as to not embarrass the board member. *Id.* LUBA found that there was no proof that the transaction was expressly contingent on the board member's vote and determined that the transaction was not so one-sided as to constitute a sham or an implicit "pay-off" for his vote. *Id.* LUBA concluded that 1000 Friends of Oregon had not carried its burden of proving disqualifying bias. *Id.*

On review, the court first clarified that *Fasano* had held that elected local officials must maintain impartiality "only towards the parties and issues 'in the matter,' not toward all individuals and all competing interests in the

community generally, and similarly, that the disqualifying contacts must be 'concerning the question at issue.'" *Id.* at 81. The court concluded that, for purposes of evaluating impartiality, the "matter" and "question at issue" were narrowly limited to the proposal to incorporate Rajneeshpuram. *Id.*

Next, the court explored the proper standard of bias, asking whether the party challenging impartiality had to prove actual bias or just a lack of appearance of impartiality. *Id.* at 81-82. To resolve that question, the court recognized, as we did in *Eastgate Theatre*, the distinction between judicial officers and elected local officials making decisions in quasi-judicial proceedings. Quasi-judicial decisions, the court wrote, "should resemble adjudications in important respects that bear on the procedural fairness and substantive correctness of the decision, but in other respects these bodies remain more 'quasi' than judicial." *Id.* at 82. The court emphasized that the decision makers are "politically elected to positions that do not separate legislative from executive and judicial power on the state or federal model; characteristically they combine lawmaking with administration that is sometimes executive and sometimes adjudicative." *Id.* Because of that dynamic, "[t]he combination leaves little room to demand that an elected board member who actively pursues a particular view of the community's interest in his policymaking role must maintain an appearance of having no such view when the decision is to be made by an adjudicatory procedure." *Id.* at 82-83.

Employing the terms "actual bias" as the counterpart to the requisite "actual impartiality," the court explained that actual impartiality "protects the substantive quality of the official action as well as the parties' interest in its fairness." *Id.* at 85. The court elaborated:

> "Invalidation for appearance alone * * * aims to preserve public confidence, and it does so regardless whether the decision in fact was both correct and fair. The price of such invalidation is delay of what, but for appearances, is a proper application of public policy, at potentially heavy cost to an innocently successful proponent as well as to the agency."

*Id.* The court concluded that there was no legal basis for invalidating the vote of the county commission. There was

no finding that the board member gained anything from voting to submit the incorporation to an election, and without a determination of actual bias or financial interest, there was no basis to invalidate the decision. *Id.* at 88.

All told, no single case in Oregon establishes what is necessary for a party to prove actual bias by an elected official in quasi-judicial land-use proceedings such as this one. Generally, we can glean the following. The bar for disqualification is high; no published case has concluded that disqualification was required in quasi-judicial land-use proceedings. An elected local official's "intense involvement in the affairs of the community" or "political predisposition" is not grounds for disqualification. Involvement with other governmental organizations that may have an interest in the decision does not require disqualification. An elected local official is not expected to have no appearance of having views on matters of community interest when a decision on the matter is to be made by an adjudicatory procedure.

In addition to those general observations, there are three salient principles from the case law that define and drive our analysis in this case. *First,* the scope of the "matter" and "question at issue" is narrowly limited to the specific decision that is before the tribunal. *Second,* because of the nature of elected local officials making decisions in quasi-judicial proceedings, the bias must be actual, not merely apparent. And *third,* the substantive standard for actual bias is that the decision maker has so prejudged the particular matter as to be incapable of determining its merits on the basis of the evidence and arguments presented. *Beck v. City of Tillamook,* 113 Or App 660, 662-63, 833 P2d 1327 (1992) (adopting LUBA's statement of the standard for prejudgment bias).

### 3. *LUBA's determination of bias*

LUBA reviewed over a half-dozen circumstances that OPC offered as evidence of bias. Huhtala's activities date back to his 2005 campaign for a position as a commissioner for the Port of Astoria, when he ran on an anti-LNG platform. He made statements against Calpine LNG's attempts to receive land-use approvals for an LNG terminal in Warrenton, saying, for example, that he "hopes a new port

commission could take a stand against the Calpine lease."[13] According to a newspaper article, Huhtala declared as part of his campaign issues and goals, "It could become the policy of the Port of Astoria that we oppose the construction of a liquified natural gas facility anywhere in the Columbia River Estuary and direct staff to do everything possible to make that happen." In evaluating Huhtala's 2005 campaign actions, LUBA noted that his statements were the kind of community policy positions that do not "in and of themselves" require recusal. Nevertheless, LUBA concluded that those statements should be considered in the "totality of Huhtala's activities."

LUBA examined Huhtala's actions in 2006 opposing an application for a comprehensive plan amendment to facilitate approval of an LNG terminal in Warrenton. The Warrenton LNG terminal is part of the same overall project as OPC's pipeline to bring LNG facilities to the Columbia River estuary. When the amendment was approved, Huhtala and other parties appealed that decision to LUBA and the Court of Appeals. In evaluating whether Huhtala's opposition to the Warrenton terminal was evidence of bias against OPC's application, LUBA recognized that, although those proceedings and the proceedings regarding OPC's application were "technically different proceedings before different local governments," the pipeline and terminal are parts of the same overall project and proposal. LUBA declared that "there is simply no reason to believe Huhtala's opposition to the LNG facility in Warrenton * * * does not extend to OPC's pipeline, which with other pipeline segments is necessary to make the Warrenton LNG facility operational." Accordingly, LUBA appears to have considered Huhtala's opposition to the Warrenton facility as part of the same "matter" at issue.

In 2008, Huhtala, another individual, Columbia Riverkeeper, and the Columbia River Business Alliance (CRBA) petitioned LUBA for review of a Clatsop County decision that had approved comprehensive plan and zoning ordinance amendments that were necessary to develop an "entirely different" LNG facility at Bradwood Landing.

---

[13] OPC is an affiliated company of Oregon LNG. Calpine LNG was the predecessor of Oregon LNG.

Based on arguments made by the petitioners including Huhtala, LUBA remanded the decision to the county, and we affirmed LUBA's decision in that matter. *See Columbia Riverkeeper v. Clatsop County*, 238 Or App 439, 243 P3d 82 (2010). LUBA agreed that Huhtala's participation in those proceedings was evidence of his consistent opposition to LNG facilities. LUBA noted that

> "while [his] consistent opposition in general, and opposition to the Bradwood proposal in particular, are relevant considerations in determining whether Huhtala has disqualifying bias in this proceeding concerning OPC's pipeline proposal, that opposition by itself would certainly not amount to disqualifying bias. We consider it, however, as part of the totality of Huhtala's actions."

LUBA considered a letter written in 2009 by Huhtala in his capacity as executive director of the CRBA in which he argued that the Oregon Department of State Lands should have charged Calpine LNG more than $38,000 to lease the 92-acre site intended for the Warrenton terminal. LUBA did not assign much significance to the letter viewed in isolation, but "consider[ed] it as part of the totality of Huhtala's activities in this matter."

LUBA analyzed statements by Huhtala, in his capacity as both "a resident" and as executive director of the CRBA, in which he commended a legislator who supported proposed legislation entitled the LNG Public Protection Act. Huhtala praised the legislator for "leadership on the LNG issue," writing, "We support finding ways to protect the Columbia River and its people because our businesses depend on the health of the River." LUBA considered those statements, too, in "the totality of Huhtala's actions," although it indicated that "viewed in isolation, they lend almost no support for [OPC's] contention that Huhtala is biased in this matter to a degree that he should have disqualified himself in this matter."

Huhtala ran for the Oregon House of Representatives in 2009. In his campaign, he stated that his opponent "has been aiding and abetting LNG speculators with their plans to bring foreign fossil fuels to Oregon for shipment through massive pipelines to California. This is intolerable." LUBA again noted that, in isolation, Huhtala's statement reflected

"the kind of policy positions that political candidates are expected to take and by themselves provide little or no support for petitioner's contention that Huhtala is biased to such a degree that he should have disqualified himself." Nevertheless, LUBA considered those statements, as well, as part of the totality of Huhtala's actions.

LUBA examined Huhtala's actions during his 2010 campaign for Clatsop County Commissioner. During that campaign, he wrote a letter to a local newspaper regarding the Bradwood Landing LNG facility:

> "It may not be time to celebrate victory in our struggle to stop liquefied natural gas. But I gave a cheer on behalf of the people of the Lower Columbia when I heard that Oregon's Department of Environmental Quality refused to bow to NorthStar's demands.
>
> "The state agency insists that sound science form the basis of any permit that might be issued to the LNG company. And they won't be rushed.
>
> "The state wants proof that this unprecedented proposal would not harm salmon, and that other environmental and economic functions of the river will be protected. This is the right attitude.
>
> "\* \* \* \* \*
>
> "We're getting closer to the point when these LNG projects will be shut down. Then we can fully celebrate. In the meantime, let's take every opportunity to vote for leaders that will properly represent us. And let's give credit to agencies that do the right thing."

At a candidates' forum in April 2010, a local newspaper reported that Huhtala proclaimed that the Bradwood Landing terminal was a "breathtakingly bad idea." In evaluating Huhtala's campaign actions, LUBA acknowledged that Huhtala's statements were ostensibly directed at the Bradwood Landing project, but explained that his statement in the paper

> "appears to have been directed at all LNG proposals, including OPC's proposed pipeline. While we conclude that the letter to the paper and the statements made at the candidates' forum both come short of promising to vote with an

anti-LNG bias and calling for voters to vote for candidates with such a bias, the statements come fairly close to doing so. The statements were made after the OPC application was submitted, while OPC's application was pending before the Clatsop County Board of Commissioners and appear to encompass OPC's proposal. That makes the statements harder to dismiss as mere campaign expressions of a community policy position that could be set aside in the event Huhtala was elected and required to serve as a quasi-judicial decision maker on OPC's application. While we do not agree that these statements, in and of themselves, are adequate to show Huhtala has the kind of bias against OPC's proposal or LNG proposals in general that compel his recusal in this matter, they are sufficient to call his ability to be an impartial quasi-judicial decision maker on OPC's application into question."

Finally, LUBA considered Huhtala's statement, made in response to OPC's bias challenge at the board's February 2011 meeting. After answering questions related to OPC's specific allegations of bias, Huhtala generally addressed his ability to remain impartial:

"It is clear that I've personally expressed many concerns about many aspects of LNG transport. You know, as I mentioned, tanker traffic, dredging issues, safety, the size of the facility in Bradwood, the road conditions—some of the same issues the applicant raised in the Bradwood situation. My reasonable concerns don't cause me to prejudge the situation. This is a complex application. There is nothing that prevents me from assessing the facts under review. I have the ability to set aside any personal views and to evaluate, discuss and vote on matters of fact. Of course I expressed personal opinions while campaigning. Citizens expect politicians to have opinions, but past association or articulation does not predict future decisions that will be based on the record of facts. I enter this hearing without preconception. I understand my responsibility in a quasi-judicial setting. I take it seriously that I need to remain unbiased during this process and set aside personal views. We all have personal views. One thing that I have been elected to do is sit impartially in a quasi-judicial setting and make decisions based upon the facts."

LUBA responded that "[t]he issue for us in this appeal is whether that statement is credible, given the totality of

Huhtala's actions in opposition to LNG facilities over a period of a number of years."

LUBA summarized that most of the actions taken by Huhtala demonstrated that, as a matter of policy, Huhtala had been a strong and consistent opponent of LNG development in Clatsop County, and that those activities, considered in isolation, "are likely not strong enough evidence of bias to require Huhtala's disqualification."[14] LUBA, however, reasoned that those actions took on additional significance when they were considered with the timing of Huhtala's vote to reconsider the board's November 2010 decision. LUBA noted that, when Huhtala took office on January 12, 2011, the board had already rendered a final decision on November 8, 2010, and the decision had been appealed to LUBA for review of the merits. According to LUBA, "Huhtala's decision to vote to withdraw the decision and to deny the application were not necessary, either to render a final decision in this matter or to insure a correct decision." LUBA concluded that "Huhtala could have been motivated entirely by a desire to ensure that the county's decision on OPC's application is legally sound, [but] * * * it seriously undermines any ability to conclude consistently with this record that Huhtala was motivated solely by an interest in achieving a legally correct decision." Rather, his actions were "most consistent with a view that Huhtala was driven more by his past opposition to LNG facilities and less by any concern he may have had regarding the legal merits of the withdrawn decision." LUBA concluded that

> "Huhtala's action to take the additional step of pulling that decision back for reconsideration, when viewed with all the other evidence that he is not capable of being impartial in this matter, is collectively clear and unmistakable evidence that Huhtala acted in this matter with actual bias and should have refrained from voting to withdraw the decision and voting to deny it."

### 4. *Did LUBA err?*

Whether Huhtala demonstrated actual bias under the impartial tribunal requirement ultimately presents

---

[14] LUBA did, however, reject outright OPC's contention that Huhtala's positions as executive director of the CRBA, and on the advisory board of Columbia Riverkeeper indicated bias.

a mixed question of fact and law. We first review LUBA's implicit and explicit findings of historical fact regarding Huhtala's actions to determine whether those findings are supported by substantial evidence. *See 1000 Friends of Oregon*, 304 Or at 88 (characterizing LUBA as the factfinding agency for impartiality challenges). We then determine whether those facts, and reasonably derived inferences, are legally sufficient to establish disqualifying actual bias. *See Eastgate Theatre*, 37 Or App at 754-55 (indicating that the quasi-judicial procedural requirement mandated in *Fasano* presented a question of law). Here, the facts on which LUBA relied to evaluate Huhtala's bias are undisputed and in written form. Accordingly, our review is limited to whether the facts, with reasonably derived inferences, are legally sufficient to establish actual bias by Huhtala.

For the reasons that follow, we conclude that the evidence in this record is legally insufficient to establish that Huhtala had so prejudged OPC's application as to be incapable of rendering a decision on the merits of the evidence and argument presented. Accordingly, LUBA erred in determining that Huhtala should have disqualified himself from the deliberation and vote that yielded the October 16, 2013, order rejecting OPC's application.

Central to our analysis and conclusion is the premise, grounded in *1000 Friends of Oregon*, that the referent "matter" for assessing actual bias is precisely and narrowly defined. *See* 267 Or App at 603. Although OPC's application is part of a larger project involving multiple jurisdictions and facilities, the sole matter before the board was OPC's pipeline application. That "matter" is so limited because Huhtala's role in evaluating OPC's application was to apply the applicable land-use laws to a discrete set of facts and evidence. *See 1000 Friends of Oregon*, 304 Or at 81. Accordingly, Huhtala's opposition to other aspects of the larger LNG project or different LNG projects, involving the application of land-use laws to other discrete facts, is collateral to any consideration of alleged actual bias as to OPC's application.

Given that the referent "matter" is so limited, a variety of actions and statements by Huhtala are not, either individually or collectively, legally sufficient to establish,

either directly or by way of permissible circumstantial inference, disqualifying actual bias. Those actions and statements include the following: (1) his 2005 campaign statements, (2) his 2006 opposition to the comprehensive plan amendment related to the Warrenton LNG terminal, (3) his participation in legal proceedings related to the Bradwood Landing terminal or statements directed at the "defeat" of that project, (4) his 2009 letter on behalf of the CRBA, (5) his comments praising "anti-LNG legislation," (6) his campaign comments relating to LNG during his 2009 campaign for the Oregon legislature, and (7) his 2010 letter to the newspaper about "sound science" as a prerequisite to a permit for a different facility and its general encouragement for voters to elect leaders critical of LNG projects. In none of those instances did Huhtala explicitly, or by necessary implication, commit to an irrevocable position on the merits of OPC's application. Rather, in each of those instances, Huhtala's actions manifested a nondisqualifying general "political predispostion," *Eastgate Theatre*, 37 Or App at 752-53, against LNG-related projects.

Thus, the inquiry reduces to whether those instances in which Huhtala did address OPC's application were legally sufficient to support a determination of actual bias as to that matter. LUBA, as noted, focused on two such operative events: Huhtala's vote to withdraw the board's November 2010 approval decision and his statement at the February 2011 board meeting that he could remain impartial. LUBA concluded that Huhtala's profession of impartiality was not credible given the totality of his other actions.

We disagree that the evidence is sufficient to establish actual disqualifying bias. Because Huthala's statement of impartiality is not evidence of bias, the only action that relates specifically to OPC's application is Huhtala's vote to withdraw the decision for reconsideration. LUBA relied on circumstantial evidence of Huhtala's political predisposition and his involvement with anti-LNG causes, and drew an inference as to Huhtala's motivation for voting to withdraw the approval decision, to conclude that Huhtala had actual bias. Given that actual bias is the standard, as opposed to apparent bias, there must be a distinction between the two. We conclude that actual bias can be established, where

prejudgment has been alleged, by explicit statements, pledges, or commitments that the elected local official has prejudged the specific matter before the tribunal. It cannot be established circumstantially or internally except by necessary and indisputable implication. This record lacks the type of explicit action by Huhtala that would support a determination of actual bias.[15]

We realize that our decision sets a high bar for disqualification in circumstances like those presented here. Nevertheless, we believe that *Fasano* and its progeny dictate that result. In *1000 Friends of Oregon*, the Supreme Court mandated that there must be a distinction between "actual bias" and an "appearance of bias." 304 Or at 81. Oregon courts have repeatedly emphasized the unique political nature of elected, local officials making adjudicatory decisions. The *Fasano* impartial-tribunal requirement must be carefully applied in light of that unique nature.

Our application of the "actual impartiality" standard "protects the substantive quality of the official action as well as the parties' interest in its fairness." *1000 Friends of Oregon*, 304 Or at 85. Referring to a stricter but problematic alternative, the Supreme Court cautioned,

"Invalidation for appearance alone * * * aims to preserve public confidence, and it does so regardless whether the decision in fact was both correct and fair. The price of such invalidation is delay of what, but for appearances, is a proper application of public policy, at potentially heavy cost to an innocently successful proponent as well as to the agency."

*Id.* Here, the standard we applied protects the substantive quality of the county's decision because the merits of the board's decision are still subject to review. LUBA has yet to consider OPC's challenges to the board's findings on denial of the pipeline application.

---

[15] Although there are no examples of explicit action that would support an actual bias determination in our case law, LUBA's decision in *Friends of Jacksonville v. City of Jacksonville*, 42 Or LUBA 137 (2002), provides such an example. In that case, a newly elected city councilor had stated during his campaign that he did not feel the need to be objective regarding a pending application by a church that he had advocated for before his election. As LUBA concluded in that case, such a statement was an explicit action that the councilor had prejudged the matter before the tribunal.

For those reasons, we conclude that the evidence was insufficient to demonstrate that actual bias impaired Huhtala's involvement in the county's decision. Accordingly, on the county's cross-petition, we reverse the portion of LUBA's final order in LUBA No. 2013-106 that concluded otherwise.

E.  *Disclosure of* ex parte *contacts*

Finally, OPC contends that LUBA incorrectly determined that the three newly elected commissioners adequately disclosed *ex parte* communications that had occurred before they took office. OPC relies on ORS 215.422(3), which provides:

> "No decision or action of a planning commission or county governing body shall be invalid due to ex parte contact or bias resulting from ex parte contact with a member of the decision-making body, if the member of the decision-making body receiving the contact:
>
> "(a)  Places on the record the substance of any written or oral ex parte communications concerning the decision or action; and
>
> "(b)  Has a public announcement of the content of the communication and of the parties' right to rebut the substance of the communication made at the first hearing following the communication where action will be considered or taken on the subject to which the communication related."

LUBA concluded that Birkby and Lee had made appropriate disclaimers of any *ex parte* contact on the record. We agree with LUBA and reject OPC's argument that Birkby and Lee failed to make adequate disclosures under ORS 215.422(3). As for Huhtala, LUBA declined to reach the issue given its conclusion that he was precluded by bias from participating in the decision on OPC's application on remand. The record as to Huhtala, however, is like that of the other commissioners. In response to county counsel's broad invitation to report *ex parte* contacts, even including "contacts" prior to assuming office, nothing was volunteered or reported.[16]

---

[16] We are not called upon to review the breadth of that advice, and we express no opinion about the application of disclosure requirements prior to assuming office.

In the absence of any evidence to the contrary, the lack of a response does not mean a failure to report something. Huhtala indicated that he had not talked to OPC nor any of its adversarier about the pipeline application, and he added that he had been careful to avoid talking to anyone about the application after his election. Accordingly, the record does not show any violation of ORS 215.422(3). OPC's third assignment of error provides no basis upon which to conclude that LUBA erred.

## III.  CONCLUSION

To summarize, we reject OPC's first, third, and fourth assignments of error, and given our resolution of the county's cross-petition, we need not address OPC's second assignment. As to the first assignment, LUBA correctly determined that actions taken after the board's "final action" approving OPC's application could not be "for the purposes of avoiding the requirements of ORS 215.427." Accordingly, ORS 197.835(10)(a)(B) did not require LUBA to reinstate the board's original decision. As to the third assignment, LUBA correctly determined that the county timely withdrew its original decision approving the application. As to OPC's fourth assignment, LUBA determined that the *ex parte* disclosures of Birkby and Lee were adequate. We agree, and we also conclude that Huhtala's disclosures were adequate. As to the county's cross-petition, we conclude that the evidence was insufficient as a matter of law to demonstrate actual bias by Huhtala, and we reverse that portion of LUBA's final order. Accordingly, the proceedings are remanded to LUBA so that LUBA can evaluate OPC's substantive land-use challenges to the board's decision on reconsideration that denied OPC's application.

In LUBA No. 2010-109, affirmed on petition. In LUBA No. 2013-106, affirmed on petition; on cross-petition, reversed and remanded as to that portion of the final order determining Commissioner Huhtala to be biased.